## PEIRCE v. VAN DUSEN.

(Circuit Court of Appeals, Sixth Circuit. February 2, 1897.)

### No. 375.

1. RAILROAD RECEIVERS—INJURIES TO EMPLOYES—CONSTRUCTION OF STATUTE.

The Ohio act of April 2, 1890, for the protection and relief of railroad employés (Laws Ohio 1890, p. 149), providing that railroad or railway corporations or companies shall not make certain contracts for exemption from liability to their employés, shall not use defective cars, etc., and that in actions against such companies for personal injuries to employés the rule as to fellow servants is to a certain extent abrogated, applies to suits brought against a receiver of a railroad corporation operating its road.

**2. SAME—STATE STATUTES—FEDERAL COURTS.**

Said statute is not applicable alone to railroad corporations of Ohio, engaged in the domestic commerce of the state, but to all railroad corporations doing business in Ohio. It does not encroach upon federal authority, nor upon the jurisdiction and powers of the federal courts, and is binding upon those courts, and upon receivers appointed by them.

**3. SAME—CONSTITUTIONALITY OF STATUTE—UNIFORM OPERATION.**

The third section of said statute, altering the rule as to the liability of an employer for the negligence of fellow servants, as it applies to all railroad corporations operating railroads in the state, and to all of a given class of railroad employés, is not repugnant to the provision of the constitution of Ohio that all laws of a general nature shall have uniform operation throughout the state. Shaver v. Pennsylvania Co., 71 Fed. 931, distinguished.

**4. SAME—NEGLIGENCE OF FELLOW SERVANTS.**

The negligence of a fellow servant for which the employer is made liable by said statute is not merely negligence in the performance of a duty imposed on the master personally, but negligence in the performance of work pertaining to the negligent employé and others in the same work.

**5. SAME—EVIDENCE—RES GESTÆ.**

Where a railroad employé has been injured by the movement of cars about which he was at work, statements of the conductor of the train, made almost immediately, and while the cars were moving or had just stopped, and while the injured man was bleeding from the injury at that moment received, describing his own part in bringing about the motion that effected the injury, are admissible, on the trial of an action for such injury, as part of the res gestæ.

In Error to the Circuit Court of the United States for the Western Division of the Northern District of Ohio.

Clarence Brown, for plaintiff in error.

Orville S. Brumback and Charles A. Thatcher, for defendant in error.

Before HARLAN, Circuit Justice, and TAFT and LURTON, Circuit Judges.

HARLAN, Circuit Justice. This action was brought by Edward Van Dusen against R. B. F. Peirce, as the receiver of the Toledo, St. Louis & Kansas City Railroad Company, a corporation organized under the laws of this state.

The order appointing Peirce as receiver was made by the court below in the case of Continental Trust Co. of New York v. Toledo, St. L. & K. C. R. Co., 72 Fed. 92. It directed the receiver to operate the railroad, and do all things necessary to carry on the business of the company. He was so engaged on the 26th day of February, 1895, when the plaintiff, a yard brakeman, in the employ of the receiver, was so seriously and permanently injured while in the discharge of his duties—being himself without fault—that he lost entirely the use of his right hand. These injuries, it is alleged, were caused solely through the carelessness and negligence of one Bartley, a conductor employed by the receiver, and under whose control and direction the plaintiff was placed at the time of his being injured.

The defendant denied the allegations imputing negligence to him, and denied that the plaintiff was without fault.

A verdict was returned in favor of the plaintiff for $5,500 in damages. A motion for a new trial having been made and overruled, judgment was entered upon the verdict.

The principal question before us is whether the statute of Ohio passed April 2, 1890 (Laws Ohio 1890, p. 149), entitled "An act for the protection and relief of railroad employés; forbidding certain rules, regulations, contracts and agreements, and declaring them unlawful; declaring it unlawful to use cars or locomotives which are defective, or defective machinery or attachments thereto belonging, and declaring such corporation liable, in certain cases, for injuries received by its servants and employés on account of the carelessness or negligence of a fellow-servant or employé,"—is applicable to cases against the receiver of a railroad corporation, especially one acting under the orders of a federal court.

The first section of the act provides that:

"It shall be unlawful for any railroad or railway corporation or company owning and operating, or operating, or that may hereafter own or operate a railroad in whole or in part in this state, to adopt or promulgate any rule or regulation for the government of its servants or employés, or make or enter into any contract or agreement with any person in or about to engage in its service, in which, or by the terms of which, such employé in any manner, directly or indirectly, promises or agrees to hold such corporation or company harmless, on account of any injury he may receive by reason of any accident to, breakage, defect or insufficiency in the cars or machinery and attachments thereto belonging, upon any cars so owned and operated, or being run and operated by such corporation or company, being defective, and any such rule, regulation, contract or agreement shall be of no effect. It shall be unlawful for any corporation to compel or require directly or indirectly an employé to join any company association whatsoever, or to withhold any part of an employé's wages or his salary for the payment of dues or assessments in any society or organization whatsoever, or demand or require either as a condition precedent to securing employment or being employed, and said railroad or railway company shall not discharge any employé because he refuses or neglects to become a member of any society or organization. And if any employé is discharged he may, at any time within ten days after receiving a notice of his discharge, demand the reason of said discharge, and said railway or railroad company shall thereupon furnish said reason to said discharged employé in writing. And no railroad company, insurance society or association, or other person shall demand, accept, require or enter into any contract, agreement or stipulation with any person about to enter, or in the employ of any railroad company whereby such person stipulates or agrees to surrender or waive any right to damages against any railroad company, thereafter arising for personal injury or death, or whereby he agrees to surrender or waive in case he asserts the same, any other right whatsoever, and all such stipulation and agreements shall be void, and every corporation, association or person violating or aiding or abetting in the violation of this section shall for each offense forfeit and pay to the person wronged or deprived of his rights hereunder the sum of not less than fifty dollars ($50) nor more than five hundred dollars ($500) to be recovered in a civil action."

By the second section it is made—

"Unlawful for any such corporation to knowingly or negligently use or operate any car or locomotive that is defective, or any car or locomotive upon which the machinery or attachments thereto belonging are in any manner defective. If the employé of any such corporation shall receive any injury by reason of any defect in any car or locomotive, or in the machinery or attachments thereto belonging, owned and operated, or being run and operated by such corporation, such corporation shall be deemed to have had knowledge of such defect before and at the time such injury is so sustained, and when the fact of such defect shall be made to appear at the trial of any action in the courts of this state, brought by such employé, or his legal representatives, against any railroad corporation for damages, on account of such injuries so received, the same shall be prima facie evidence of negligence on the part of such corporation."

The third section, which is the one whose scope and meaning is involved in this action. provides that:

"In all actions against the railroad company for personal injury to, or death resulting from personal injury of, any person, while in the employ of such company, arising from the negligence of such company or any of its officers or employés, it shall be held in addition to the liability now existing by law, that every person in the employ of such company, actually having power or authority to direct or control any other employé of such company, is not the fellow-servant, but superior of such other employé, also that every person in the employ of such company having charge or control of employés in any separate branch or department, shall be held to be the superior and not fellow-servant of employés in any other branch or department who have no power to direct or control in the branch or department.in which they are employed."

At the trial below it was contended on behalf of the plaintiff that the conductor and switchmen or yard brakemen, even when engaged together, at the same time and place, in operating the same train of cars, were not to be deemed fellow servants within the rule exempting an employer from liability to one servant for an injury caused by the negligence of a fellow servant. The circuit court, held by Judge Hammond, without determining this question as one of general law, decided that the case was governed by the third section of the above act of April 2, 1890, and, consequently, that Bartley, the conductor, having power to direct and control the work in which Van Dusen was engaged, was the superior, not the.fellow servant, of Van Dusen, and was, therefore, the representative of the receiver.

The contention of the receiver is that that act by its terms applies only to corporations owning or operating railroads in whole or in part in Ohio by their own officers, and that it cannot properly be construed as applying to receivers operating railroads under the orders of a court of chancery. There are adjudged cases arising under statutes similar to the Ohio statute which seem to sustain this contention of the receiver. Henderson v. Walker, 55 Ga. 481; Campbell v. Cook, 86 Tex. 630, 634, 26 S. W. 486.

If the reasoning of the Georgia and Texas courts be applied to the Ohio statute, it cannot be held to embrace employés acting under the receiver of a railroad corporation. But, in our judgment, the statute is applicable to actions against receivers of railroad corporations. To hold otherwise would be to subordinate the reason of the law altogether to its letter. While the intention of the legislature must be ascertained from the words used to express it, the manifest reason and the obvious purpose of the law should not be sacrificed to a literal interpretation of such words. If the Ohio statute is construed as applicable only to actions for personal injuries brought directly against railroad corporations, the result would be that in an action brought in one of the courts of Ohio the employés of a railroad corporation would·be accorded rights that would be denied in another action of like kind, perhaps in the same court, to employés of the receiver of a railroad corporation under exactly similar circumstances. Could such a result have been contemplated by the legislature of Ohio? We think not. The avowed object of the statute was the protection and relief of railroad employés. To that end it declared that in the actions mentioned in it every person employed by the railroad com-

pany, and invested with power or authority to direct or control other employés, should be deemed the superior, not the fellow servant, of those under his direction and control. The legal effect, as well as the object, of this declaration was, in the cases specified, to make the negligence of the superior the negligence of the company. No violence is done to the ordinary meaning of the words of the statute if it be held that the legislature had in mind actions against receivers of railroad corporations as well as actions directly against such corporations. The appointment of a receiver of a railroad does not change the title to the property nor work a dissolution of the corporation. Although the creature of the court, and acting under its orders, the receiver, for most purposes, stands in the place of the corporation, exercising its general powers, asserting its rights, controlling its property, carrying out the objects for which it was created, discharging the public duties resting upon it, and representing the interests as well of those who own the railroad as of those who have claims against the corporation or its property. The corporation remains in existence notwithstanding a provisional receivership established by an order of court: and for the purpose of effectuating the will of the state, as manifested by the act of 1890, an action against the receiver arising out of his management of the property may be regarded as one against the corporation "in the hands of" or "in the possession of" the receiver. McNulta v. Lochridge, 141 U. S. 327, 331, 12 Sup. Ct. 11.

In Central Trust Co. v. Wabash, St. L. & P. Ry. Co. (1886) 26 Fed. 12, it was held that the statute of Missouri giving double damages against "every railroad corporation" which did not erect and maintain fences, openings, gates, farm crossings, and cattle guards on the line of its road (the validity of which act was sustained in Railway Co. v. Humes, 115 U. S. 512, 6 Sup. Ct. 110), was held applicable to a railroad in the hands of a receiver. To the same effect was Hornsby v. Eddy, 5 C. C. A. 560, 572, 56 Fed. 461, where the question was as to the applicability to federal receivers of a railroad of a statute of Kansas providing that "every railroad company" organized or doing business in that state "shall be liable for all damages done to any employé of such company, in consequence of any negligence of its agents, or by any mismanagement of its engineers or other employés, to any person sustaining such damage." In that case, the circuit court of appeals for the Eighth circuit well said:

"It is clear that, with respect to persons employed by a railway company as railway operatives, the statute last above quoted changes the rule of the common law that the master is not liable to a servant for an injury sustained in consequence of the negligence of a fellow servant. Does the fact that a receiver is appointed to temporarily operate a railroad forthwith alter the status of all of its employés, and re-establish as to them the old rule of the common law, so long as the receiver remains in charge? Viewing the question in the light of those considerations of public policy which probably gave birth to the statute, we cannot conceive of any reason why the appointment of a receiver should have such effect. It is a fact of which we may well take judicial notice that great railway systems, which employ thousands of men, are frequently operated for a term of years through the agency of a receiver. Such receivers do not, as a general rule, change the working force of the road, or the rules and regulations by which trains are run, or by which the other business of the road is transacted. The men

whom they employ are engaged in the same quasi public service as other railway employés, and daily encounter the same risks and hazards. Furthermore, the receiver of a railroad operates it for the immediate benefit of the company by which it is owned, in that he discharges all of the public duties of the corporation, and appropriates the income of its road to the preservation of its property and franchises, and to the payment of its debts."

So much as to the scope and true meaning of the Ohio statute, without reference to the courts in which it may be enforced. If the statute means what we hold it to mean, must not full effect be given to it in actions for personal injuries brought against a receiver in a court of the United States? This question must be answered in the affirmative. Such legislation is not liable to the objection that it encroaches upon federal authority, or upon the jurisdiction or power of the United States court. The statute does nothing more than to prescribe a rule of action to be observed by all within the state. The authority to enact it is derived from the general power of the state to regulate the exercise of the relative rights and duties, and to provide for the safety, of all persons within its territorial jurisdiction. It is the duty of the federal court sitting in this state to enforce all enactments having such objects in view, unless they encroach upon the powers and authority of the United States. That duty arises out of the statute declaring that "the laws of the several states, except where the constitution, treaties or statutes of the United States otherwise require or provide, shall be regarded as rules of decision in trials at common law in the courts of the United States, in cases where they apply." Rev. St. § 721; Baltimore & O. R. Co. v. Camp, 31 U. S. App. 213, 13 C. C. A. 233, and 65 Fed. 952. Indeed, if congress had not so declared, this court, upon principles of comity, and in support of the public policy of the state, might well recognize and enforce, in actions brought against receivers of railroads, any rule established by the state for like actions brought against railroad companies.

The Ohio statute is not applicable alone to railroad corporations of Ohio engaged in the domestic commerce of this state. It is equally applicable to railroad corporations doing business in Ohio, and engaged in commerce among the states, although the statute, in its operation, may affect in some degree a subject over which congress can exert full power. The states may do many things affecting commerce with foreign nations and among the several states until congress covers the subject by national legislation. This principle is illustrated in many cases; as in Cooley v. Board, 12 How. 299, 320, where the pilot laws of Pennsylvania were sustained, and were held to have been enacted in virtue of the power residing in the state to legislate, congress not having abrogated them nor established regulations inconsistent with them; as in Sherlock v. Alling, 93 U. S. 99, 104, where the court held that a statute of Indiana, giving a right of action to the personal representatives of a deceased when his death was caused by the wrongful act or omission of another, was applicable to the case of death resulting from collisions between vessels engaged in interstate commerce, and in which case it was said, generally, "that the leg-

islation of a state, not directed against commerce or any of its regulations, but relating to the rights, duties, and liabilities of citizens, and only indirectly and remotely affecting the operations of commerce, is of obligatory force upon citizens within its territorial jurisdiction, whether on land or water, or engaged in commerce, foreign or interstate, or in any other pursuit"; as in Morgan's Louisiana & T. R. & S. S. Co. v. Louisiana Board of Health, 118 U. S. 455, 463, 6 Sup. Ct. 1114, where a quarantine statute of Louisiana, directly affecting commerce among the states and with foreign nations, was held not to be void as a regulation of commerce, but was valid under the power of the state to protect the public health, and was to be respected until the system of quarantine established by it was abrogated or displaced by congress; as in Smith v. Alabama, 124 U. S. 465, 8 Sup. Ct. 564, where a statute of Alabama was upheld that required all locomotive engineers in that state, whether they served on trains engaged in domestic commerce or only on trains engaged in interstate commerce, to be examined and licensed by a state board before acting as engineers within that state; and as in Nashville, C. & St. L. Ry. Co. v. Alabama, 128 U. S. 96, 100, 9 Sup. Ct. 28, in which the court held to be constitutional a state enactment requiring all locomotive engineers to be examined by a state board for color blindness, and in which case it was said that "wherever there is any business in which, either from the products created or the instrumentalities used, there is danger to life and property, it is not only within the power of the states, but it is among their plain duties, to make provision against accidents likely to follow in such business, so that the dangers attending it may be guarded against so far as is practicable," and which local enactments were to be deemed valid until congress took action on the subject. In Telegraph Co. v. James, 162 U. S. 650, 662, 16 Sup. Ct. 934, the supreme court of the United States held a statute of Georgia requiring every telegraph company with a line of wires wholly or partly within that state to receive dispatches, and, on payment of the usual charges, to transmit and deliver them with due diligence, under a named penalty, to be a valid exercise of the police power of the state in relation to interstate messages. The court said:

"While it is vitally important that commerce between the states should be unembarrassed by vexatious state regulations regarding it, yet, on the other hand, there are many occasions where the police power of the state can be properly exercised to insure a faithful and prompt performance of duty within the limits of the state upon the part of those who are engaged in interstate commerce. We think the statute in question is one of that class, and, in the absence of any legislation by congress, the statute is a valid exercise of the power of the state over the subject."

In Hennington v. State of Georgia, 163 U. S. 299, 317, 16 Sup. Ct. 1086, in which a statute of Georgia forbidding the running of freight trains in that state on the Sabbath day was assailed as unconstitutional when applied to interstate commerce, the supreme court of the United States, upon a review of the adjudged cases, held it to be clear that:

"The legislative enactments of the states, passed under their admitted police powers, and having a real relation to the domestic peace, order, health, and safety of their people, but which, by their necessary operation, affect to some extent, or for a limited time, the conduct of commerce among the states, are yet not invalid by force alone of the grant of power to congress to regulate such commerce; and, if not obnoxious to some other constitutional provision, or destructive of some right secured by the fundamental law, are to be respected in the courts of the Union until they are superseded and displaced by some act of congress passed in execution of the powers granted to it by the constitution."

Undoubtedly, the whole subject of the liability of interstate railroad companies for the negligence of those in their service may be covered by national legislation enacted by congress under its power to regulate commerce among the states. But, as congress has not dealt with that subject, it was competent for Ohio to declare that an employé of any railroad corporation doing business here, including those engaged in commerce among the states, shall be deemed, in respect to his acts within this state, the superior, not the fellow servant, of other employés placed under his control. If the effect of the Ohio statute be, as undoubtedly it is, to impose upon such corporations, in particular circumstances, a liability for injuries received by some of its employés which would not otherwise rest upon them according to the principles of general law, that fact does not release the federal court from its obligation to enforce the enactments of the state. Of the validity of such state legislation we entertain no doubt. In Railway Co. v. Mackey, 127 U. S. 205, 208, 210, 8 Sup. Ct. 1161, the supreme court had occasion to consider several objections to a law of Kansas making railroad companies liable for injuries suffered by employés through the negligence of their fellow servants. Replying to the objection that such legislation denied the equal protection of the laws to railroad companies, in that it did not apply alike to all corporations, the court said:

"But the hazardous character of the business of operating a railway would seem to call for special legislation with respect to railroad corporations, having for its object the protection of their employés as well as the safety of the public. The business of other corporations is not subject to similar dangers to their employés, and no objections, therefore, can be made to the legislation on the ground of its making an unjust discrimination."

There is another view of this matter, equally conclusive. By Act Cong. March 3, 1887, c. 373 (24 Stat. 554), corrected by Act Aug. 13, 1888, c. 866 (25 Stat. 433), it is provided:

"Sec. 2. That whenever in any cause pending in any court of the United States there shall be a receiver or manager in possession of any property, such receiver or manager shall manage and operate such property according to the requirements of the valid laws of the state in which such property shall be situated in the same manner the owner or. possessor thereof would be bound to do if in possession thereof. Any receiver or manager who shall wilfully violate the provisions of this section shall be deemed guilty of a misdemeanor, and shall on conviction thereof be punished by a fine not exceeding three thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

"Sec. 3. That every receiver or manager of any property appointed by any court of the United States may be sued in respect of any act or transaction of his in carrying on the business connected with such property, without the previous leave of the court in which such receiver or manager was appointed; but such suit shall

be subject to the general equity jurisdiction of the court in which such receiver or manager was appointed, so far as the same shall be necessary to the ends of justice."

It would seem to be clear that, under this act of congress, if a railroad in the possession of a federal receiver is to be managed and operated according to the requirements of the laws of the state in which the property is situated, "in the same manner that the owner or possessor thereof would be bound to do if in possession thereof," such management and operation must be subject to any rule prescribed by the state imposing upon railroad corporations liability for the negligence of employés having superior authority over other employés.

This we understand to be the effect of the decision in Eddy v. Lafayette, 163 U. S. 456, 464, 16 Sup. Ct. 1082, in which the question arose whether the local statutes regulating the service of process against a railway corporation were applicable to actions against the receivers of such corporations. The trial court and the circuit court of appeals were of opinion that the third section of the judiciary act of March 3, 1887, c. 373, § 2 (24 Stat. 552, 554), authorizing suits to be brought against receivers of railroads without special leave of the court by which they were appointed, was intended to place receivers "upon the same plane with railroad companies," both as respects their liability to be sued for acts done while operating a railroad and as respects the mode of service of process. This court said:

"We concur in that view, and in the conclusion reached, that the service in the present case, on an agent of the receivers, was sufficient to bring them into court in a suit arising within the Indian Territory."

But it is contended that the Ohio statute is repugnant to the provision of the constitution of Ohio declaring that "all laws of a general nature shall have uniform operation throughout the state." Article 2, § 26. The argument made in support of this view by the learned counsel for the receiver may be thus summarized: That the act imposes a liability for damages for the negligence of fellow servants only as against a railroad company operating a railroad within Ohio; that it confers a right of action only upon employés of such railroad companies; that no other employer is subject to the liability, and no other employé is given the right; that the act selects from the general class of employers railroad companies operating railroads, and imposes upon them a special burden; that the act is special class legislation, not uniform throughout the state, and applies to no person or company engaged in any other occupation employing servants, although the occupation be equally hazardous. Consequently, the act is special in its operation and effect, is confined to particular corporations engaged in a specific business, does not cover the whole subject of the relations of master and servant, and is not, therefore, of a general nature, and of uniform operation throughout the state, within the meaning of the constitution of Ohio.

In support of these views counsel have referred to Shaver v. Pennsylvania Co., 71 Fed. 931, which was an action to recover dam-

ages for personal injuries alleged to have resulted from the negligence of a railroad corporation and its agents. The defense was that the plaintiff, by becoming a member of an organization known as the "Voluntary Relief Department of the Pennsylvania Lines West of Pittsburgh," and accepting the benefits of said association, had agreed that the railroad company should be discharged from any and all liability to him on account of such injuries. The plaintiff demurred to the answer upon the ground that the agreement referred to was invalid under the above statute of Ohio of 1890, which, as we have seen, provides in its first section that:

"No railroad company, insurance company, or association, or other person shall demand, accept, require, or enter into any contract, agreement, stipulation with any other person about to enter, or in the employ of any railroad company whereby such person stipulates or agrees to surrender or waive any right to damages against any railroad company, thereafter arising for personal injury or death, or whereby he agrees to surrender or waive, in case he asserts the same, any other right whatsoever, and all such stipulations or agreements shall be void," etc.

Judge Ricks held that the contract relied on by the railroad company was valid, and that the statute of Ohio declaring it to be void was unconstitutional.

"The Ohio statute," he said, "in denying to the employés of a railroad corporation the right to make their own contracts concerning their own labor, is depriving them of 'liberty,' and of the right to exercise the privileges of manhood, 'without due process of law.' Being directed solely to employés of railroads, it is class legislation of the most vicious character. Laws must be not only uniform in their application throughout the territory over which the legislative jurisdiction extends, but they must apply to all classes of citizens alike. There cannot be one law for railroad employés, another law for employés in factories, and another law for employés on a farm or the highways. Class legislation is dangerous. Statutes intended to favor one class often become oppressive, tyrannical, and proscriptive to other classes never intended to be affected thereby; so that the framers of our constitution, learning from experience, wisely provided that the laws should be general in their nature and uniform throughout the state."

The court, elsewhere in its opinion, when considering the scope of the constitutional provision that all laws of a general nature shall have uniform operation throughout the state, said:

"The act under consideration, while it is general in its nature, applies only to railroad companies and their employés, and is not, therefore, general in its application, and does not operate uniformly on all classes of citizens. Under this statute, railroad companies are prohibited from making contracts which other corporations in the state are allowed to make. * * * The act under consideration is certainly one which impairs the rights of a large number of the citizens of Ohio to exercise a privilege which is dear to all persons, namely, that of making contracts concerning their own labor and the fruits thereof, and, so far as it relates to such contracts already made, impairs their validity. The act seems to assume that a large class of the citizens of the state, namely, those employed by railroad corporations, are incapable of making contracts for their own labor."

It may be proper here to observe that in a case recently determined by the supreme court of Ohio a contract such as the one involved in Shaver's Case was held not to be interdicted by the above act of April 2, 1890 (87 Ohio Laws, 149), and was not contrary to public policy. Railway Co. v. Cox, 45 N. E. 641.

It is quite clear from an examination of Judge Ricks' opinion that he intended to decide nothing more—indeed, the case, under his view of the statute, required nothing more to be decided—than

that the part of the act of 1890 relating to contracts or agreements, whereby a right to damages against a railroad company, arising from personal injury or death, was surrendered or waived when the employé became a member of the relief association referred to, was unconstitutional, as depriving the employés of railroad corporations of their liberty without due process of law. He had no occasion, in the case before him, to consider the validity of the third section of that act. The first section might be held void, leaving the third section in full force. Even if the act of 1890, in the particulars involved in Shaver's Case, and for the reasons stated by Judge Ricks, were held to be unconstitutional,—upon which question it is unnecessary to express an opinion,—the statute, in respect of the matters mentioned in the third section, can be sustained as one of a general nature, and having uniform operation throughout the state.

This general question has been considered by the supreme court of Ohio. In McGill v. State, 34 Ohio St. 238, the court, referring to the constitutional provision requiring all laws of a general nature to have a uniform operation throughout the state, said:

"A general law that land should not be sold upon execution for less than two-thirds of its appraised value was excluded from operation in several counties by local enactment. There were different laws in different counties respecting the descent and distribution of intestate property. Some statutes defining legal offenses were excluded in their operation from a large part of the state; and different penalties for a violation of the same act were, in some instances, provided for different localities. These are examples of the legislation to prevent which in the future, and the mischief resulting from it, this provision of the constitution was adopted. But no wider scope was claimed for it than to guard the future against the evils and inequalities resulting from legislation of the character complained of."

See, also, Lehman v. McBride, 15 Ohio St. 573, 653; Ex parte Falk, 42 Ohio St. 638, 641; Costello v. Village of Wyoming, 49 Ohio St. 202, 30 N. E. 613.

In State v. Nelson, 52 Ohio St. 88, 97, 39 N. E. 22, where the question was whether an act entitled "An act requiring persons, associations and corporations owning or operating street cars to provide for the well-being of the employés"—the act, in its provisions, being made applicable only to electric street cars other than trail cars—was in conflict with the constitutional provision requiring all laws of a general nature to have a uniform operation throughout the state, the court said:

"The act in question is clearly of a general nature, so that the only inquiry left is whether it is of uniform operation throughout the state. And here again it is equally clear that the law is in operation throughout every part of the state, uniformly as to all classes therein named. Is this sufficient? Soon after the adoption of the constitution it was said by this court that the scope and purpose of this section was to prevent laws of a general nature from being in force in some counties and not in others, and these early cases have been followed ever since."

Again:

"Of late years an effort has frequently been made to claim for this section of the constitution a wider scope than to guard against the evils resulting from legislation of the character mentioned by Thurman, J., in Cass v. Dillon, 2 Ohio St.

607, Scott, J., in Lehman v. McBride, Boynton, J., in McGill v. State, and Okey, J., in Ex parte Falk; but such efforts have uniformly failed. The only statutes which have been declared in conflict with this section of the constitution are statutes making different classes of different parts of the territory of the state, such as cities, villages, etc. This section of the constitution requires that laws of a general nature shall have not only an operation, but a uniform operation, throughout the state; that is, the whole state, and not only in one or more counties. The operation must be uniform upon the subject-matter of the statute. It cannot operate upon the named subject-matter in one part of the state differently from what it operates upon it in other parts of the state; that is, the law must operate uniformly on the named subject-matter in every part of the state, and when it does that it complies with this section of the constitution. That this is the scope and purpose of this section appears from its language, the debates of the constitutional convention, and the uniform construction placed thereon by this court in the cases above cited, and others hereinafter referred to. * * * In Adler v. Whitbeck, 44 Ohio St. 539, 9 N. E. 672, an effort was made to have the statute there under consideration declared unconstitutional because its classification included saloons and excluded distilleries and breweries, but the effort failed. A similar effort was made in Senior v. Ratterman, 44 Ohio St. 661, 11 N. E. 321, because wholesale dealers and manufacturers were not included within the same class, and the effort again failed. A similar effort was made in State v. Turnpike Co., 37 Ohio St. 481, as to the classification of turnpikes, and the effort again failed. * * * The scope and force of this section of our constitution being as herein indicated, it is clear that the statute in question is not in conflict therewith. The statute is in operation in every part of the state, and operates uniformly upon the classes of persons therein designated in every part of the state. The act is clearly authorized as a police regulation to protect the health and promote the comfort of those engaged in operating electric cars."

The question under consideration is somewhat like that presented in Harwood v. Wentworth, 162 U. S. 547, .563, 16 Sup. Ct. 890. There the question was whether an act of the legislature of Arizona fixing the compensation of county officers, and for that purpose classifying the counties of the state according to the assessed valuation of property in each county, was a local or special act. If so, it was void, as repugnant to an act of congress declaring that the legislatures of the territories shall not pass local or special laws in certain cases. The practical effect of the act was to establish higher salaries in some counties for the particular officers named than for the same class of officers in other counties. "But," the supreme court said, "that does not make it a local or special law. The act is general in its operation; it applies to all counties in the territory; it prescribes a rule for the stated compensation of certain public officers; no officer of the classes named is exempted from its operation; and there is such a relation between the salaries fixed for each class of counties, and the equalized assessed valuation of property in them, respectively, as to show that the act is not local and special in any just sense, but is general in ,its application to the whole territory, and designed to establish a. system for compensating county officers that is not intrinsically unjust, nor capable of being applied for purposes merely local or special."

We do not deem it necessary to pursue this subject further. We think it clear that the Ohio statute is not obnoxious to the constitutional provision requiring all laws of a general nature to have a uniform operation throughout the state. As it applies to all

railroad corporations operating railroads within the state, it is, within the meaning of the state constitution, general in its nature; and, as it applies to all of a given class of railroad employés, it operates uniformly throughout the state.

It is next contended by the plaintiff in error that if Van Dusen was injured by the negligence of Bartley, the conductor, he is not entitled to recover, for the reason that the latter was not negligent in the performance of any duty imposed by law on the master personally, but only in respect of the performance of work pertaining to him and other employés in the same work. The principal authorities cited in support of this view are Railroad Co. v. Keegan, 160 U. S. 259, 16 Sup. Ct. 269, and Stockmeyer v. Reed, 55 Fed. 259.

If this contention were sustained, the statute of Ohio would be deprived of all practical value, and the manifest object of the legislature in passing it would be defeated. The Keegan and Stockmeyer Cases enforced the general rule that a foreman or superintendent of a body of employés doing a particular service was a fellow servant of those under him, and, consequently, the common employer was not liable to one of them for the negligence of the other. The very object of the statute before us was to prevent the application of that rule in Ohio as between a railroad company and its employés. Hence it declared that every person in the employ of a railroad company, "having power or authority to direct or control any other employé of such company, is not the fellow servant, but the superior, of such other employé." If, by force of the statute, Bartley was not a fellow servant, but the superior, of Van Dusen, he did not become, within the meaning of the statute, a fellow servant simply because he did some work of the kind done by Van Dusen. The object of the statute was to make one to whom is committed by a railway company the authority to direct and control employés in the same service the representative, in respect of that service, of the common employer, so that his acts, within the scope of his employment, are the acts of the company, and his negligence its negligence.

That the evidence was such as to require the submission of the question of negligence to the jury is, in our judgment, too manifest to require discussion. Indeed, so far from there being no proof to support the allegation of negligence, the preponderance of evidence on that issue was with the plaintiff.

It is said that the damages found were excessive, and that the judgment below should, for that reason, be reversed. That was a question for the consideration of the trial court on a motion for a new trial. Upon a writ of error this court can deal only with questions of law. If there was a case of disputed facts upon which the plaintiff was entitled to go to the jury,—as undoubtedly there was,—it was for the jury to assess the damages; and, if the trial court did not disturb the verdict upon the ground that the damages were excessive, that was the end of the question of damages. As that court laid down no rule for the assessment of damages that was erroneous in law, this court is without power to revise

78 F.—45

the judgment in respect of the amount of damages. It is restricted in its consideration of the case to questions of law. Railroad Co. v. Fraloff, 100 U. S. 24, 31.

It is alleged that error was committed in permitting plaintiff, against the objection of the defendant, to prove what Bartley, the conductor, said just after the plaintiff was injured. The conductor and those under him were very near each other during the performance of the work committed to them. Van Dusen testified that his hand was caught and held fast while the car that mashed it backed up five or ten feet. Getting his hand out as soon as the car backed, he came from between the cars, and walked towards the engine, holding his hand up. The engineer got off the engine, and, with Bartley, came towards Van Dusen. Being asked how long after the accident before Bartley met him, Van Dusen said: "It was not a minute,—that is, a minute after I got my hand out and walked towards the engine;". and that it may have been "six or seven car lengths" before he met Bartley. Being asked what Bartley said to him at that time, the question was objected to, but the court permitted him to answer, upon the ground that it came "within the rule of the res gestæ," and that "what was said by this plaintiff and what was said by the engineer or by the conductor in the very doing of this thing is a part of the thing itself." The plaintiff answered: "Well, I asked Mr. Bartley what in the world he was trying to do, coming back on me the second time without saying anything about making a second cut. He said: 'Ed, I am sorry. I was going to put this car on the elevator track. When I backed up, I did not see you. I did not know just where you was until I heard you holler.'"

We are of opinion that this evidence was properly admitted. Its exclusion was not required by the rule that "an act done by an agent cannot be varied, qualified, or explained, either by his declarations which amount to no more than a mere narrative of a past occurrence, or by an isolated conversation held or an isolated act done at a later period." Packet Co. v. Clough, 20 Wall. 528, 540. The case is rather covered by the rule formulated by Greenleaf (1 Greenl. Ev. § 113), and sanctioned by the supreme court in Railroad Co. v. O'Brien, 119 U. S. 99, 105, 7 Sup. Ct. 118, namely:

"The party's own admission, whenever made, may be given in evidence against him; but the admission or declaration of his agent binds him only when it is made during the continuance of the agency in regard to a transaction then depending, et dum fervet opus. It is because it is a verbal act, and part of the res gestæ, that it is admissible at all, and therefore it is not necessary to call the agent to prove it; but wherever what he did is admissible in evidence, there it is competent to prove what he said about the act while he was doing it."

Judge Hammond, in an opinion overruling the motion for a new trial, properly indicated the situation, when he said that the conductor "almost immediately, and while the cars were moving, or had just stopped, and while the plaintiff was bleeding from the injury at that moment received, described his own part in bringing about the motion that effected the injury." The rule insisted upon for the exclusion of such declarations would, he said, "ex-

clude everything from the res gestæ which did not occur on the very instant of the grinding of the flesh and bones by the colliding car." In O'Brien's Case the question was as to the admissibility of certain declarations of a railroad engineer as to the rate of speed at which his train was moving at the time of the accident. The court said:

"Although the speed of the train was, in some degree, subject to his control, still his authority, in that respect, did not carry with it authority to make declarations or admissions at a subsequent time as to the manner in which, on any particular trip, or at any designated point in his route, he had performed his duty. His declarations, after the accident had become a completed fact, and when he was not performing the duties of engineer, that the train, at the moment the plaintiff was injured, was being run at the rate of eighteen miles an hour, was not explanatory of anything in which he was then engaged. It did not accompany the act from which the injuries in question arose. It was, in its essence, the mere narration of a past occurrence, not a part of the res gestæ; simply an assertion or representation, in the course of conversation, as to a matter not then pending, and in respect of which his authority as engineer had been fully exerted."

We recognize the difficulty of laying down a rule upon this subject that would apply in every case. But we do not doubt that, both upon principle and authority, the declarations of Bartley, tending to show that the injury to Van Dusen was to be attributed to his (Bartley's) negligence, were admissible in evidence as part of the res gestæ.[1] These declarations cannot properly be characterized as hearsay, for they really accompanied the transaction out of which arose the injury. The principal matter was the doing of certain work under the supervision of one having authority to control those engaged in it. The statements of the conductor were made while the work was in progress, while the plaintiff was assisting him, and in presence of the fact necessary to be explained. They illustrated what had, up to the moment of such statements, been done by him in the prosecution of the work. What the conductor and Van Dusen set out together to do was not completed, and what the former said was almost simultaneous with the doing of the thing causing the injury. The infliction of the injury and his explanation of his conduct were so close together that they may be said to have occurred at the same time. His declarations, therefore, were not, in any proper sense, a mere narrative of past occurrences, but were part of the occasion out of which the plaintiff's cause of action arose. They served to disclose the nature and quality of the acts in question, and were made under circumstances pre-

[1] Railroad Co. v. Ashley, 14 C. C. A. 368, 67 Fed. 209; Insurance Co. v. Cheever, 36 Ohio St. 201, 207; Keyser v. Railway Co., 66 Mich. 390, 33 N. W. 867; Rockwell v. Taylor, 41 Conn. 55, 59; Waldele v. Railroad Co., 95 N. Y. 274; Railroad Co. v. Coyle, 55 Pa. St. 402; Lund v. Inhabitants of Tyngsborough, 9 Cush. 36; Carrying Co. v. Gnuse, 137 Ill. 264, 27 N. E. 190; Hermes v. Railway Co., 80 Wis. 590, 50 N. W. 584; Hooker v. Railway Co., 76 Wis. 542, 44 N. W. 1085; Hill v. Com., 2 Grat. 594, 605; Elledge v. Railway Co., 100 Cal. 282, 34 Pac. 720; State v. Molisse, 38 La. Ann. 381; McLeod v. Ginther's Adm'r, 80 Ky. 399; Railroad Co. v. Foley (Ky.) 21 S. W. 866; Shafer v. Lacock, 168 Pa. St. 497, 32 Atl. 44; Baltimore & O. R. Co. v. State (Md.) 32 Atl. 201; Railway Co. v. Buck, 116 Ind. 566, 19 N. E. 453; Brownell v. Railroad Co., 47 Mo. 239.

cluding the possibility of premeditation, design, or deliberation on the part of the conductor. They were made on the spot where the injury occurred. To exclude them would be to make their admissibility in evidence depend wholly upon the matter of time, although the circumstances show such direct and immediate connection between the thing done and the declarations of the person having such thing in charge as to justify the court in characterizing the transaction as one continuous,. uncompleted transaction, and such declarations to be part of it.

Having considered all the matters presented by the record which, in our judgment require consideration, and perceiving no error of law in the record, the judgment is affirmed.