HUNTER v. KANSAS CITY & M. RAILWAY & BRIDGE CO.

(Circuit Court of Appeals, Sixth Circuit. February 8, 1898.)

No. 532.

1. MASTER AND SERVANT—FELLOW SERVANT OF RAILROAD EMPLOYE.

A carpenter was engaged with common laborers in setting posts along a railroad, his part of the work being to make measurements in order to ascertain where holes were to be dug, direct the setting of the posts, and see that they were set plumb, at a certain height, and a certain distance from the track. He was under the direction of a foreman in charge of the work. *Held*, that such carpenter and laborers were fellow servants, under the Arkansas statute defining railroad fellow servants as "persons engaged in the common service of such railroad corporation, * * * working together to a common purpose, * * * neither being intrusted by such corporation with any superintendence or control over their fellow employés."

2. SAME—ACTION FOR PERSONAL INJURIES—NEGLIGENCE OF EMPLOYE.

Where the cause of action is based on the declaration that a fellow employé negligently, carelessly, and wantonly released his hold upon a post he was

lowering into a hole, thus causing plaintiff's injury, and the proof shows that he slipped and lost his hold on the post, because of the slippery character of the ground, and no other negligence is shown, there can be no recovery.

In Error from the Circuit Court of the United States for the Western District of Tennessee.

This was an action commenced in the circuit court of Shelby county, Tenn., by the plaintiff in error, a citizen of Tennessee, against defendant in error, a corporation existing under the law of Arkansas, and removed, upon the ground of diversity of citizenship, by the defendant, into the circuit court of the United States. The suit was brought for the purpose of recovering damages for a personal injury resulting to plaintiff when in the service of the defendant, from an alleged negligent act of one Robert Snowden, who it is alleged stood at the time in the relation of a vice principal to the plaintiff. The injury occurred in the state of Arkansas, and the case largely turned below upon the question as to whether said Robert Snowden was in fact a vice principal or a fellow servant under a statute of the state of Arkansas passed in 1893. At the conclusion of all the evidence the court instructed for the defendant upon the ground that Snowden was not a vice principal, but a fellow servant with plaintiff. The evidence relating to this subject was substantially as follows:

The plaintiff testified in his own behalf that he was a laborer in the employment of the railroad company, and engaged, in company with Bob Snowden, a white mechanic, and Jim Dowd, a negro, in setting posts alongside the railroad track; that he was down in the bottom of a wide post hole, and that the other two men were on the ground on top, letting the post down into the hole; that they had a wire bridle around the post, with a stick through it, one man at each end; that he was down in the hole directing the descent, with the post hugged in his arms; that suddenly the men above appeared to turn the post loose, and the post rapidly descended, and pulled him downward, wrenching his back. Plaintiff did not see the cause of the sudden fall of the post, as he was down in the hole and not looking up. He testified that there were four men in his gang, himself and two other colored men, one named Dowd and the other Taylor, and a white man by the name of Snowden, whom he calls "the boss of the gang." When asked about the services being rendered by Snowden, the witness said that Snowden was a mechanic; that he measured the distance the top of each post was to stand from the rail of the track, and plumbed it with a spirit level, to bring the top of the post to a level with the rail. He said: "We would move the post anyway he said move it, and, after we got it plumb, would throw dirt around it, and another gang came on behind us and filled the hole up." The witness also said that Taylor and Dowd had theretofore been engaged in lowering the posts to plaintiff, but that, before the particular post in question was lowered, Snowden told Taylor to deepen one of the adjacent holes, and himself undertook, with Dowd, to lower the post that plaintiff was guiding. He describes Taylor as a large and strong man physically, and Snowden as a small and weak man, though plaintiff does not undertake to say what was the cause of the slipping of the post in this particular instance. Plaintiff says that he was receiving the wages of a common laborer, $1.25 per day, and that Mr. Snowden was a carpenter and mechanic, and received $2.50 per day; and that another carpenter by the name of Guth had theretofore been engaged in doing the work which Snowden was doing upon the day in question, but that Guth had been sent away by the "boss" to do work in another place, and Mr. Snowden on the day in question took his place. The plaintiff was employed by a Mr. Hanna, who was the engineer in charge of the work, Mr. Green being what he called "general boss of the post-setting business." This injury occurred on the 21st of April, 1893, and plaintiff's suit was begun more than twelve months thereafter.

J. J. Guth testified, for the plaintiff, that he was a carpenter and mechanic, and was employed in setting posts in holes alongside of the railroad. He said that Mr. Snowden was doing some carpenter work for the company, and that Mr. Green, "the boss," took witness away, and put Mr. Snowden in his place, assigning witness to work at another point. The witness was

asked to state the kind of work he was doing in connection with the plaintiff and the other members of the plaintiff's gang at the time he was relieved by Snowden. He said he was employed by Mr. Hanna, the engineer in charge of the work, and that Mr. Green, "the boss," "told me he wanted me to come down with him to show him how to put down those posts for the rack machine. He told me he was going to give me these men to dig the holes, and he gave me the gauge from the rail to the post and at the same time a level. It had to be exactly level. When I put my gauge on the rail and on the post, it had to be level. He gave me these men, some of them to dig holes, and some of them to help me plumb and set the posts. I stayed there until he wanted me to come * * * and help Mr. Green on the wires." He said: "They dug the holes and I set the posts with them. Q. They dug the holes and you helped set the posts? A. Yes, sir; I laid the holes off for them and they set the posts; of course they were helping me. Q. What did you do towards setting the posts? A. I leveled them and plumbed them. Q. When you would level them what would these men do? A. Some of them generally went down in the hole. I had to gauge the post above, and they would move it below so as to get it plumb. After they had it plumb, they throwed the dirt around it and jambed it down. Q. Now, you said you had them to move the posts? A. Yes, sir. Q. How and in what manner did you have them to move the posts? A. One of them went down, and I had what we call a 'bridle' made. I put the bridle on the post, and held the post up while the man below was moving the post. Q. You say you held the post. Did you hold it or did these men hold it? A. I held the post, and had another man to help me. I always took hold myself. Q. You had to do that in order to plumb it and level it, did you? When you went to plumb it and level it, it was necessary to do that. Was that a necessary part of it? A. No, sir. When the post wasn't setting right we had to take it out occasionally and dig the hole deeper, and I had a man down there in the hole to move it until we got it right. Q. Could you plumb it and set it without taking hold of it yourself? A. No; I raised it up myself generally. I raised that post up myself most of the time, and had a man down in the hole setting it below for me. Q. In setting those posts, who was the judge of how the post was set or ought to be set? A. I had to tell them, of course. Q. Who was responsible for the proper setting of those posts? A. Mr. Green looked to me, of course. Q. Did he look to any of those men that you said he had given you? A. Oh, no, sir. Q. You worked the level and the gauge, did you? A. Yes, sir."

The witness, Jim Dowd, one of the men at work with plaintiff, testified that he was hired by Mr. Green, "the boss": that on the day in question Mr. Snowden took Mr. Guth's place, and was helping to set posts; that they were to set posts with Henry Taylor and Hunter. The witness said that "Mr. Snowden sent Taylor back down to dig out another hole deeper before we got to it where we were setting those posts out there, and Mr. Snowden and I were letting this post down in the hole, and Hunter was placing the post down in there. It was slippery around there, and Mr. Snowden slipped, and gave way, and the post fell into the hole. It was within about three or four feet of the bottom, and he slipped and it fell into the hole. Hunter was down in the hole,—had the post in his arms. Mr. Snowden and I had hold of the bridle,—a wire on a rod three feet long. Q. You say Snowden fell in the hole? A. No, sir; didn't fall in the hole. He slipped, and, to keep from falling in the hole, he gave way on the post, and that made the post have a sort of fall over towards Mr. Snowden, where he was standing." Witness was asked: "Q. Who was directing you? Was anybody directing you over there? A. Mr. Snowden was supposed to be our boss there at that time, because they told us anything he told us to do, to do it."

Robert Snowden was also examined as a witness for the plaintiff. He testified that he was a carpenter by trade: had been employed by the railroad company to put in some lock switches; that he was employed by Mr. Hanna, the engineer of the company. "Q. Who was the foreman over there? A. Mr. Green. Q. He was in charge of the work? A. Yes, sir. Q. Did you have any authority to employ or discharge men? A. None whatever. Q. Did you have any control over or right to direct the men who were working with you? A. No, sir; Mr. Green would just say, 'Do this here,' and the men

would go together. I had no control over them. I was just the same as any other hireling. By the Court: Q. You say you were not a foreman and had no right to direct them or give orders? A. No, sir, not personally. As far as directing them I was, in one way; he would send me to do a piece of work, supposed to be mechanic's work, and he would send a couple of men, if I needed help. By the Court: Q. To help you? A. Yes, sir; to help me. Of course I would do what was wanted done, and my laborers would help me. Q. You were not what was called a foreman? A. No, sir; I was no foreman at all. Q. Just hired for wages like the other men? A. Yes, sir; hired for wages like the other men. Q. What part of the work did you do about setting those posts? A. I had a gauge. The posts had to be set a foot in height, and a certain space to line them up beside the railroad track. It was my part to take and set those posts, as I said, a certain height and a certain space from the track. I used my level and a straightedge. That was my part of the work. Q. When you all were sent off to do this work of setting those posts, were those darkies under your direction? A. They were there doing the laborer's work. Q. As directed by you? A. To set the post where I told them to put them out. Q. Where you told them to put the posts they did so? A. Yes, sir. Q. And whenever you saw fit to send away or to send them to other parts of the work, they did that? A. I had no right to send them away. Q. You were to measure and direct how it was to be done? A. That was my portion of the work. Q. And these men were to do it according to your direction? A. Of course, to lift the posts and set them in proper shape. Q. And it ordinarily took three men? A. One in the hole and two outside with the sling." The witness testified, further, that he had no recollection of having sent Taylor away on the day he assisted in setting those posts, or having himself personally undertaken to lower any posts into holes, or that he had ever heard the plaintiff complain of having received any injury while working with him at that business. He said he would not positively say that he had not upon a particular day or instance taken hold of a post himself, in the absence of one of the men, but he had no recollection of it, and none of the plaintiff having been injured while aiding in the setting of any posts.

A. B. Pittman, for plaintiff in error.

Adams, Trimble & Pratt (Wallace Pratt, of counsel), for defendant in error.

Before LURTON, Circuit Judge, and SEVERENS, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of facts, delivered the opinion of the court.

The learned counsel for the plaintiff in error concede that at common law Hunter and Snowden were fellow servants, but say that under the Arkansas statute defining that relation he was a vice principal. The Arkansas statute is as follows:

"All persons engaged in the service of any railway corporations, foreign or domestic, doing business in this state, who are intrusted by such corporation with the authority of superintendence, control or command of other persons in the employ or service of such corporation, or with the authority to direct any other employé, in the performance of any duty of such employé, are vice-principals of such corporation, and are not fellow servants with such employé.

"All persons who are engaged in the common service of such railway corporations, and who, while so engaged, are working together to a common purpose, of same grade, neither of such persons being intrusted by such corporations with any superintendence or control over their fellow employés, are fellow servants with each other; provided, nothing herein contained shall be so construed as to make employés of such corporation in the service of such corporation, fellow servants with other employés of such corporation in any other department or service of such corporation. Employés who do not come within the provisions of this section shall not be considered fellow servants." Sand. & H. Dig. §§ 6248, 6249.

Such statutes do not encroach upon federal authority, and constitute the law of the state which federal courts are bound to administer in suits arising within the state.   Peirce v. Van Dusen, 24 C. C. A. 280, 78 Fed. 693.

We have, under this evidence, the case of three men working together in the common purpose of setting a post in a hole prepared to receive it.   That Snowden received larger pay than Hunter, or that in some respects his work was not the same as that done by his associates, does not determine that he was a vice principal. The determining question under this statute is whether he was intrusted by the corporation with the authority of superintendence, control, or command of those with whom he was associated in the service of the company, or with authority to direct these other employés in the performance of their duty to the common master. When, as in this case, it is shown that several persons are associated together and working together to a common purpose in the same department, they are presumed, under the second section of the Arkansas statute, to be fellow servants, and the burden is upon him who claims that a different relation existed to establish that one was a vice principal.   Thus, in Railway Co. v. Becker, 63 Ark. 477, 39 S. W. 358, a fireman was injured by the negligence of his engineer.   Though their duties were different, yet proof that they were in the same department and working together to a common purpose was held, under the second section of this act, to raise a presumption that they were fellow servants.   That Hunter should regard Snowden as a "boss," or that he assumed to have some sort of control over those associated with him, will not make him the representative of the corporation.   The authority to control and direct others must be an authority "intrusted by such corporation" to him.   His authority may, of course, be implied from the very nature of the duties imposed upon him; but he is not a vice principal merely because his higher character, greater intelligence, superior race, or natural habit of command caused him to assume an authority not intrusted to him by the common master, or to be regarded and treated with a respect due to his personal qualities, rather than to his delegated power of control, by those associated with him. Snowden was a carpenter.   He was a white man.   His associates were colored men and ordinary laborers.   His work, in some respects, differed from that to be done by those co-operating with him. One Hanna was engineer in general charge, and hired all the men. One Green was the "boss,"—"the general boss," as plaintiff calls him, in order to make place for a subboss.

In overruling a motion for a new trial, Judge Hammond very clearly stated the effect of the evidence touching the alleged control of Snowden over his associates:

"He was a white man; and wherever two or three negro laborers are gathered together, and there is a white man engaged with them, he is naturally considered the 'boss,' and just as naturally takes certain control and direction of things. But I take it that nothing is to be implied from this condition as extending his authority to 'direct any other employé in the performance of any duty of such employé,' to use the language of the Arkansas statute.   We must determine that authority of which the statute speaks as necessary to make a vice prin-

cipal as arising from the common master himself,—in this case the bridge company,—and we must determine its nature and the limitations upon it with reference to the instructions that have been given by the master or the employment about which the servant is engaged. I hold that, on all the proof in this case, no reasonable inference can be drawn that any other authority or direction was given to Snowden than that of gauging and leveling the posts, and in the doing of this he was a co-laborer and fellow servant of the other three or five 'working together to a common purpose, of same grade,' neither of the four or six, as the case may be, being intrusted with any superintendence or control over their fellow employés, thus falling directly within the definition of fellow servant as given by the second section of the Arkansas statute. It is within the statutory description of a fellow servant contained in the second section of the statute that this case falls, and not within the first section, according to my judgment. The mere fact that this common carpenter, using the gauge and level, should in their use have occasion to 'direct' that his fellow laborers should elevate or lower a post or should move it a few inches, more or less, nearer or further from the line of the track, did not vest him with such 'authority to direct' as was contemplated by the first section of this act, any more than would be the case if one of the other three were to throw a few spadefuls, more or less, of earth into the hole, or to use more or less strokes of the rammer in tamping the earth around the post, or any other common direction like that. If Snowden should, in adjusting his gauge or using his level, have committed some error of judgment which was detected by one of the other three co-laborers, and he should say to Snowden, 'Put your level here,' or 'Your gauge here,' he would be in as much authority to give directions about the common work as Snowden would; and it is not such natural, incidental, and necessary 'direction' and 'control' as must occur whenever two or more work together to which this statute refers, but that kind of master-like command which involved the element of superior will and authority far more than Snowden had in this case."

Snowden testified that he was not a "boss," and was given no authority to command or control his associates. To him was intrusted the use of the level and the gauge, for the purpose of aiding in the proper alignment and adjustment of the posts which were being set by the co-operation of all. His directions to deepen a hole, or to move a post to the right or to the left, or to lower or to raise it, were more in the nature of the signals which a switch-tender or brakeman might give to a conductor or engineer to guide them in the movement of a train, than of commands given in the exercise of the authority of a superior over an inferior.

In Railway Co. v. Ranney, 37 Ohio St. 665–671, a case decided before the Ohio statute defining fellow servants, a question arose which involved the question as to whether an engineer, who gave signals by whistle to the brakemen to put on and release the brakes, thereby exercised a control and authority over such brakemen, that, under the decisions of Ohio, being the test as to whether the relation of vice principal existed. Judge McIlvane, a great judge, in respect to this question said:

"It is contended that these signals are in the nature of orders or commands, which the engineer is authorized to give to brakemen, which they are bound to obey, and hence the relation as superior and subordinate is created. A majority of the court do not so understand either the purpose or effect of the rule. These signals are so named properly, and are intended to notify all concerned of the thing signified. They are addressed to the conductor as well as brakemen, and it is the duty of the conductor to see that brakemen perform the duty signified. This duty is imposed upon the brakemen by force of the rule itself, and not by virtue of any authority vested in the engineer over the brakemen. The signal is a mere notice. The rule is the order of the company to the brakeman directly. Suppose a train is signaled by a station agent, as this train was, to stop for

orders. It thereby became the duty of the conductor, as well as of each employé on the train, to stop for orders; and yet no one can contend that such station agent, who gives the signal, is the superior and the train crew subordinate employés of the company, within the meaning of the rule under consideration. A variety of signals, under a variety of circumstances, are required to be given by different employés of the company, to signify that an occasion exists for the performance of a particular duty; but it would be absurd to hold that, in each case, the employé giving the signal is a superior servant, to whom all others, to whom information is thus communicated, are subordinated, so that the company would be responsible to them for any act of negligence of the employé who gave the signal, whether such negligence was in giving the signal or in the performance of other duties."

In Railroad Co. v. Camp, 31 U. S. App. 213, 231, 232, 13 C. C. A. 233, and 65 Fed. 952, this court held that a telegraph operator was not a vice principal under the Ohio fellow servant statute, which is substantially identical with the Arkansas statute under consideration. In speaking for the court, Judge Taft said:

"In our opinion, the telegraph operator has neither power nor authority to direct or control the engineer. He is only the medium through whom orders from the train dispatcher are communicated to the engineer and the conductor. He gives notice to the engineer and the conductor. He gives notice to the engineer of certain facts from which the duty of the engineer arises under the rules of the company. The conductor is in control of the train, and the engineer and the brakemen are his subordinates. Suppose that the conductor sends an order to the engineer by the brakemen: does the brakeman thereby become a person actually having power or authority to direct or control the engineer? Clearly not. The duty of the switchman in such a case is merely to give notice to the engineer of the condition of affairs upon which the engineer is required to act. And so the engineer's duty to act upon the signal from the telegraph operator does not come from any authority or power to control reposed in the telegraph operator. The authority or control is in the train dispatcher, who gives the order, not in the mere transmitter of it. When there is no order, but the telegraph operator conveys by signal to the engineer information as to the position of other trains or the condition of the track ahead, the operator is the mere register of the fact, a mere notifier, a mere giver of information upon which the engineer, under the rules of the company, at once knows his duty and acts accordingly."

The particular duty of Snowden was to use his level and gauge and announce the result. If the hole was too deep or too shallow, or the post not plumb, the fact was thereby ascertained, and it became his duty and that of his associates to do what was necessary to bring it into proper relation by deepening or filling or by other movement of the post indicated by the level and gauge. There was no sufficient evidence to overcome the presumption that the relation of fellow servant existed under the construction placed upon the second section of the Arkansas act by the supreme court of that state, and the jury were properly instructed, on this ground, to find for the defendant. If, however, it be conceded that Snowden was a vice principal, there was no evidence upon which a jury could reasonably find that he had been guilty of any negligence. Waiving the question as to whether, when engaged in co operation with Hunter and Dowd in handling this post, he was then in the exercise of any superintendence or control as such vice principal, the evidence is that the ground immediately around the top of the hole into which the post was to be set, and where Snowden and Dowd in lowering the post were necessarily required to stand, was slippery. Dowd is the only witness who speaks upon the question

as to how the post came to slip and fall upon Hunter, and he says that Snowden while engaged with him in lowering the post to Hunter slipped, and thereby lost his hold upon the post. The slippery character of the place where he stood and the kind of work he was engaged in account for the accident. He slipped because his work had to be done on a slippery place, and he lost his hold on the heavy post because of this slip. The declaration charges that Snowden "negligently, carelessly, and wantonly released his hold upon said post, thereby causing it to be precipitated with great force" against the plaintiff, etc. Now, there is no evidence to support this averment, for it is thus shown that he slipped from the slippery character of the ground on which he was obliged to stand while lowering the post. That his slipping was due to any carelessness in placing his feet, or in holding the post, is not shown. The absence of due care is not to be inferred from these facts. The burden of proof was upon the plaintiff to establish the want of due care, and this burden was not shifted by evidence that Snowden slipped, and thereby lost his hold; the slipping being explained by the evidence as to the character of the ground on which he was standing and of the work he was engaged in. "Negligence is the omission to do something which a reasonable man, guided by those considerations which ordinarily regulate the conduct of human affairs, would do, or doing something which a prudent and reasonable man would not do." Blyth v. Waterworks Co., 11 Exch. 784. There is no evidence that all the precautions necessary to the seeming exigencies of the situation were not observed to avoid hurt to others. The injury was clearly accidental. Brown v. Kendall, 6 Cush. 295; Harvey v. Dunlop, Lalor, Supp. 193; The Nitro-Glycerine Case, 15 Wall. 524. The suggestion that the sending of Taylor away and the doing of his work by Snowden, a smaller and weaker man, was the cause of the accident, does not meet the case. That the slip was due to any want of strength is not shown by any fact in the case, and, if it were, the suggested cause is too remote. Sending Taylor away was not the proximate cause of the injury, but the slipping of Snowden, due to the slippery character of the ground, an accident which might as well have happened to Taylor as another. Hoag v. Railroad Co., 85 Pa. St. 293.

The question as to whether the defendant, as a foreign corporation, having an agency and doing business within the state, was nevertheless "absent from" "or out of the state," when this action accrued under section 3458, Code Mill. & V. Tenn., so as to deprive it of the benefit of the Tennessee statute of limitations, was involved, and has been ably argued. The question has not been determined by the supreme court of Tennessee, and we have not found it necessary to decide it here, inasmuch as the judgment must be affirmed upon the grounds already considered.