## KELLEY v. GREAT NORTHERN RY. CO.

(Circuit Court, D. Minnesota, Fifth Division. March 11, 1907.)

1. COMMERCE—POWER TO REGULATE—POWER OF CONGRESS—EMPLOYERS' LIABILITY ACT.

The act of Congress of June 11, 1906, 34 Stat. 232, c. 3073, commonly called the "Federal Employers' Liability Act," is a regulation of commerce between the states or with foreign nations, within the meaning of the commerce clause of the Constitution, and hence within the power of Congress.

2. SAME—NATURE OF POWER.

Decisions defining the meaning and scope of the commerce clause of the Constitution considered and discussed, the trend of all of them being to the effect that the commercial power conferred by the Constitution authorizes legislation with respect to all the subjects of foreign and interstate commerce, the persons engaged in it, and the instruments by which it is carried on, and as to such subjects is without limitation.

3. SAME.

Decisions concerning the validity of state statutes, upon the questions involved here, considered and discussed, and from them the following general rules deduced: (1) That the liability of common carriers for injuries to their employés growing out of their negligence or the negligence of their other employés is a proper subject for governmental regulation, and Congress has the power, whenever it chooses to exercise it, to make regulations on that subject within its field of control, namely, interstate and foreign commerce, similar to those the state Legislatures may make in their field. (2) That such statutes are not, in themselves, regulations of interstate commerce, although they control, in some degree, the con-

duct and the liability of those engaged in such commerce, and a state may therefore, so long as Congress has not legislated upon the particular subject, enact them, in the rightful exercise of its police power to regulate the relative rights and duties of all persons and corporations within its limits, without invading the exclusive power of Congress. But Congress may also, under the power conferred by the commerce clause of the Constitution, enact such legislation as a regulation of interstate or foreign commerce. (3) That, while as a general rule the police power belongs to the states, yet Congress may, in the exercise of its power to regulate interstate commerce, impose upon such commerce regulations which are in their essential nature police regulations.

**4. SAME.**

If Congress, having for its object the protection of the lives and limbs of railroad employés, can make a specific regulation such as that embodied in the "Safety Appliance Act," as to which it would seem there can be no doubt (Johnson v. Southern Pacific Co., 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363), it can, with the same object in view, make a general regulation such as that embodied in this act. The object of the statute is plain upon its face. It is apparent that Congress had in contemplation much more than the mere creation and imposition of the liability mentioned. It had in contemplation the protection of the lives and persons of the employés of common carriers engaged in interstate or foreign commerce whose employment has any relation to such commerce. With that object in view, it enacted the statute, and by its provisions changed certain common-law rules determining liability in order to promote that object by securing, so far as the statute could compel it, a more careful selection of employés, a closer and more careful supervision of them, and a more rigid enforcement of their duties.

**5. SAME.**

It is the carrier engaged in interstate commerce that this act seeks to regulate in relation to its duties to its employés, and the power of Congress extends to, and the act was intended to cover, all the employés whose employment relates to such commerce; and if such common carrier is also at the same time engaged in intrastate commerce, using the same means and agencies for both, the power of Congress extends to, and the act was intended to cover, all the employés whose employment relates to such means and agencies.

**6. SAME.**

The fact that a common carrier engaged in interstate commerce may also be engaged in intrastate commerce, using therein in whole or in part the same means and agencies, cannot defeat the power of Congress to regulate such carrier. The regulation of intrastate commerce, which may result in such a case (if, indeed, in such case there could be said to be any regulation of intrastate commerce by such an act as this), is incidental, and due to the manner or method in which the carrier conducts its business, and to the fact that it thus combines or commingles its interstate with its intrastate commerce.

**7. CONSTITUTIONAL LAW—STATUTES—CONSTRUCTION IN FAVOR OF VALIDITY.**

But this act is remedial and not penal, and would therefore not only permit, but, if necessary to sustain its validity, require a liberal construction. If, therefore, it were necessary to sustain its validity, there is ample authority for so construing it as to confine its operation to those whose injuries occur at a time when they are actually engaged upon interstate traffic; the facts and circumstances of each particular case determining whether or not the act is applicable. The Trade-Mark Cases and the McKendree Case distinguished.

**8. MASTER AND SERVANT—INJURIES TO SERVANT—FELLOW SERVANTS—CONTRIBUTORY NEGLIGENCE.**

The reasoning of the cases in which the fellow-servant rule has been laid down by the courts has, in view of modern methods and conditions, lost much, and in some cases all, of its force. The contributory negli-

gence rule as applied by the courts, in view of modern conditions surrounding those engaged in certain occupations, is harsh, cruel, and unjust, and ought long since in the furtherance of justice and in the interest of humanity to have been greatly modified. And there are substantial reasons why an employer engaged in certain occupations should not be permitted to relieve himself by contract with his employés from liability for injuries caused by his negligence or the negligence of his other employés.

**9. CONSTITUTIONAL LAW—EQUAL PROTECTION OF LAWS.**

The contention that the act violates the fifth, seventh, tenth, and fourteenth amendments of the Constitution is without merit.

**10. MASTER AND SERVANT—INJURIES TO SERVANT—STATUTORY PROVISIONS.**

It appears that defendant is a railroad company engaged in interstate commerce; that plaintiff at the time of his injury, which was subsequent to the passage of the act, to wit, on the 1st day of November, 1906, was an employé of defendant, engaged in repairing its railroad track on which such commerce is carried on; and that plaintiff rested his complaint upon the provisions of the federal employers' liability act. *Held*, upon demurrer raising the point, that such act is constitutional and valid, and that the demurrer should be overruled.

(Syllabus by the Court.)

S. F. White and John H. Norton, for plaintiff.
W. A. Begg, J. A. Murphy, and Heber McHugh, for defendant.

MORRIS, District Judge. The defendant herein is a railroad company engaged in interstate commerce. The plaintiff at the time of the injury, to wit, on the 1st day of November, 1906, was an employé of the defendant, engaged in repairing its railroad track on which such commerce is carried on. The complaint rests upon two claims of negligence: The negligence of the defendant, and the negligence of its employés who were at the time of the accident the fellow servants of the plaintiff. The only ground on which the demurrer was seriously pressed was that the complaint does not state facts sufficient to constitute a cause of action. My view is that the allegations as to the negligence of the employés of defendant, who were fellow servants of plaintiff are sufficient, under the act of Congress approved June 11, 1906, entitled "An act relating to liability of common carriers in the District of Columbia and territories and common carriers engaged in commerce between the states and between the states and foreign nations to their employés," if that act is valid. The defendant has attacked its validity on constitutional grounds, and to that question the argument of counsel was mainly directed, and upon it a decision invited. If the constitutionality of the act is sustained, as I think it must be, the demurrer must fail. I have therefore deemed it necessary to decide that question, and to that question only is this opinion directed. That act, after the title above quoted, is as follows:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that every common carrier engaged in trade or commerce in the District of Columbia, or in any territory of the United States, or between the several states, or between any territory and another, or between any territory or territories and any state or states, or the District of Columbia, or with foreign nations, or between the District of Columbia and any state or states or foreign nations, shall be liable to any of its employees, or, in the case of his death, to his personal representative for the benefit of his widow and children, if any, if none, then for his parents; if

none, then for his next of kin dependent upon him, for all damages which may result from the negligence of any of its officers, agents, or employees, or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, track, roadbed, ways, or works.

"Sec. 2. That in all actions hereafter brought against any common carriers to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery where his contributory negligence was slight and that of the employer was gross in comparison, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee. All questions of negligence and contributory negligence shall be for the jury.

"Sec. 3. That no contract of employment, insurance, relief benefit, or indemnity for injury or death entered into by or on behalf of any employee, nor the acceptance of any such insurance, relief benefit, or indemnity by the person entitled thereto, shall constitute any bar or defense to any action brought to recover damages for personal injuries to or death of such employee: Provided, however, That upon the trial of such action against any common carrier the defendant may set off therein any sum it has contributed toward any such insurance, relief benefit, or indemnity that may have been paid to the injured employee, or, in case of his death, to his personal representative.

"Sec. 4. That no action shall be maintained under this act, unless commenced within one year from the time the cause of action accrued.

"Sec. 5. That nothing in this act shall be held to limit the duty of common carriers by railroads or impair the rights of their employees under the safety appliance act of March second, eighteen hundred and ninety-three, as amended April first, eighteen hundred and ninety-six, and March second, nineteen hundred and three." 34 Stat. 232, c. 3073.

As I understood the argument of counsel for defendant, it was conceded that it might not be open to question that, just as the Legislatures of the states have the right to change the rules of law determining the liability of parties as administered in their courts in cases within their jurisdiction, so has Congress the right by appropriate legislation to change such rules of law as administered in the courts of the United States, and so as to control only cases pending therein, for the reason that as mere judicial rules founded on the common law or upon considerations of public policy, but having all the force of law, they are no more sacred than legislative enactments, which may be altered or repealed at the will of the legislative department of the Government. But they contend—and in that I think they are correct—that the scope of the act in question is much broader than that, and that Congress obviously intended it to be so; that it was intended that it should become the supreme law of the land of general application, and as such binding upon all courts, state and federal, and should fix imperative rules by which all of them must hereafter be governed; and that therefore, if valid at all, it can only be valid as a regulation of commerce under the power conferred upon Congress by section 8 of article 1 of the Constitution of the United States, which, for the purposes of this discussion, is as follows:

"The Congress shall have power," among other things, "to regulate commerce with foreign nations, and among the several States, and with the Indian tribes," and " * * * to make all laws which shall be necessary and proper for carrying into execution the foregoing powers."

Proceeding, then, upon that assumption, their contention is that the act is unconstitutional and invalid.

The first ground on which that contention is based is *that the subject-matter of the act is the creation and enforcement of liabilities growing out of the negligence of common carriers engaged in interstate or foreign commerce to their employés, and it is therefore not a regulation of commerce among the states or with foreign nations, within the meaning of that clause of the Constitution, and hence not within the power of Congress.*

As preliminary and leading up to a more direct consideration of the power of Congress in reference to such legislation as that embodied in this act, it may be well to call attention very briefly to some of the decisions, state and federal, as to the power of the state Legislatures in reference thereto, a proper understanding of which will prepare us to correctly apprehend the true doctrine in reference to the extent of the power reposed in Congress. It can no longer be questioned, in the face of these decisions, that the common-law rules which are affected by this act are simply rules of decision enunciated by the courts, according to their ideas of justice and public policy, and are necessarily subject to the control of the state Legislatures in the exercise of what is commonly termed the police power. But when the state legislation is directed to particular occupations, such, for instance, as that of railroad companies, it is subject to certain limitations growing out of the constitutional provisions of the fourteenth amendment, prohibiting the taking of property without due process of law, or the denying to any person the equal protection of the laws, or an interference with the liberty of contract. It seems that the contributory negligence rule has never been directly modified by state legislation; at least none such has been called to my attention. But the reasoning of the cases would apply with equal force to that rule.

These decisions were rendered in cases which arose under various state statutes:

In Missouri Pacific Ry. Co. v. Mackey, 127 U. S. 205, 8 Sup. Ct. 1161, 32 L. Ed. 107, under a Kansas statute, which provided that "every railroad company organized or doing business in this state, shall be liable for all damages done to any employé of such company in consequence of any negligence of its agents, or by any mismanagement of its engineers, or other employees, to any person sustaining such damage"; in Minneapolis and St. Louis Ry. Co. v. Herrick, 127 U. S. 210, 8 Sup. Ct. 1176, 32 L. Ed. 109, under a statute of Iowa, providing that "every corporation operating a railway shall be liable for all damages sustained by any person, including employees of such corporation, in consequence of the neglect of agents, or by any mismanagement of the engineers or other employees of the corporation, and in consequence of the willful wrongs, whether of commission or omission, of such agents, engineers, or other employees, when such wrongs are in any manner connected with the use and operation of any railway on or about which they are employed, and no contract which restricts such liability shall be legal or binding"; in McGuire v. C. B. & Q. Ry. Co. (Iowa) 108 N. W. 902, under the Iowa statute, after it had been amended by adding a provision similar to that contained in section 3 of the act of Congress here in question, to the effect that no contract of relief benefit or indemnity entered into prior to the injury, between

the person so injured and such corporation, should constitute a bar or defense to an action under the statute; in Tullis v. Lake Erie & Western R. R. Co., 175 U. S. 348, 20 Sup. Ct. 136, 44 L. Ed. 192, under a statute of Indiana, in reference to the liability of railroad and other corporations, for damages for personal injuries suffered by an employé while in its service; in Martin v. Pittsburg & Lake Erie R. Co., 27 Sup. Ct. Rep. 100, 203 U. S. 284, 51 L. Ed. ——, under a statute of Pennsylvania, which will be set forth hereafter. And many other cases under similar statutes might be cited.

All of these decisions are to the effect that it is competent for a state, in the exercise of the police power, to change or modify the rules of decision determining the liability of employers to their employés, as applied to particular pursuits or callings, and that legislation to that effect is not obnoxious to the fourteenth amendment to the Constitution, if all persons brought under its influence are treated alike under similar circumstances and conditions, and if, with a wide legislative discretion, the classification is practical and not palpably arbitrary. In other words, the liability of those in particular occupations, as, for instance, railroad companies, for injuries to their employés, is a proper subject for governmental regulation, and a state may make such reasonable regulations on the subject with respect to all within its territorial jurisdiction as the Legislature thereof may think that the public welfare demands, subject only to the limitations above indicated.

Counsel for defendant, as I have understood them, not only admit, but urge, that such is the well-established law; but they contend that such legislation is within the power of the state Legislatures only, and that it is not within the power of Congress under the commerce clause of the Constitution to enact such a statute as that here under consideration with reference to common carriers' engaged in interstate commerce, because it merely changes or modifies the common-law rules determining the *liability*, and thus merely creates a *liability* of such carriers to their employés for their negligence or for the negligence of the fellow servants of the injured employé, and in no way prescribes rules for carrying on traffic or commerce among the states, and therefore in no way regulates such commerce.

As I have said above, I have referred to and given the effect of the foregoing decisions, because I think they prepare us to correctly apprehend the effect of those which more nearly touch the above contention, and from which the true doctrine in reference to the extent of the power of Congress may be ascertained. In this latter class are those decisions in which the Supreme Court of the United States has had under consideration state statutes whose validity was attacked on the ground that they affected interstate commerce, and were regulations of such commerce, and were therefore within the exclusive power of Congress. While it might be said that in none of these cases was the exact question raised which is here being considered, yet, as I think, they not only throw light upon it, but indicate beyond question the views entertained thereon by the justices of our highest court.

But, before proceeding to the consideration of these cases, let us first ascertain, as far as we can, from other decisions, the meaning and scope of the commerce clause of the Constitution.

In determining the meaning and scope of that clause the Supreme Court has, from the time of the delivery of the opinion of the great Chief Justice in Gibbons v. Ogden, until now, seemed to think it undesirable to give to the words therein any hard and fast definition, or to mark with absolute certainty the extent of the power thereby conferred. It has been declared that "interstate commerce" is a term of very large significance (Hopkins v. U. S., 171 U. S. 578, 597, 19 Sup. Ct. 40, 43 L. Ed. 290, citing many cases), and that the power conferred by the Constitution is, as to interstate and foreign commerce, one without limitation. "It authorizes legislation with respect to all the subjects of foreign and interstate commerce, *the persons engaged in it, and the instruments by which it is carried on."* Sherlock v. Alling, *infra.*

In Telegraph Company v. Texas, 105 U. S. 460, 464, 26 L. Ed. 1067, the court says:

"In Pensacola Telegraph Company v. Western Union Telegraph Company, 96 U. S. 1, 24 L. Ed. 708, this court held that the telegraph was an instrument of commerce, and that telegraph companies were subject to the regulating power of Congress in respect to their foreign and interstate business. A telegraph company occupies the same relation to commerce as a carrier of messages that a railroad company does as a carrier of goods. *Both companies are instruments of commerce, and their business is commerce itself."*

In this opinion the italics in all quotations are my own.

In Lottery Cases, 188 U. S. 321, 346, 23 Sup. Ct. 321, 47 L. Ed. 492, Mr. Justice Harlan, delivering the opinion of the majority of the court, reviews at great length the cases in which the court has considered the meaning of the term "commerce among the several states" in the commerce clause of the Constitution, and the power of Congress thereunder, and very completely summarizes the effect of the decisions. I can only quote a small portion of what he says, but an examination of the case will show the very large significance of the term and the difficulty of giving it a precise definition and the wide scope of the power. He says:

"The leading case under the commerce clause of the Constitution is Gibbons v. Ogden, 9 Wheat. 1, 189, 194, 6 L. Ed. 23. Referring to that clause, Chief Justice Marshall said: 'The subject to be regulated is "commerce"; and our Constitution being, as was aptly said at the bar, one of enumeration and not of definition, to ascertain the extent of the power, it becomes necessary to settle the meaning of the word. The counsel for the appellee would limit it to traffic, to buying and selling, or the interchange of commodities, and do not admit that it comprehends navigation. This would restrict a general term, applicable to many objects, to one of its significations. "Commerce," undoubtedly, is traffic, but it is something more; it is intercourse. * * * It has been truly said that "commerce," as the word is used in the Constitution, is a unit, every part of which is indicated by the term. If this be the admitted meaning of the word, in its applications to foreign nations, it must carry the same meaning throughout the sentence, and remain a unit, unless there be some plain, intelligible cause which alters it. The subject to which the power is next applied is to commerce "among the several States." The word "among" means intermingled with. A thing which is among others is intermingled with them. Commerce among the states cannot stop at the external boundary line of each state, but may be introduced into the interior. It is not intended to say that these words comprehend that commerce, which is completely internal, which is carried on between man and man in a state, or between different parts of the same state, and which does not extend to or af-

fect other states. Such a power would be inconvenient and is certainly unnecessary. Comprehensive as the word "among" is, it may very properly be restricted to that commerce which concerns more states than one. * * * The genius and character of the whole government seem to be that its action is to be applied to all the external concerns of the Nation and to those internal concerns which affect the states generally; but not to those which are completely within a particular state, which do not affect other states, and with which it is not necessary to interfere for the purpose of executing some of the general powers of the government. * * *'

"Again: 'We are now arrived at the inquiry: What is this power? It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is *complete in itself*, may be exercised *to its utmost extent*, and acknowledges *no limitations, other than are prescribed in the Constitution*. These are expressed in plain terms, and do not affect the questions which arise in this case, or which have been discussed at the bar. If, as has always been understood, the sovereignty of Congress, though limited to specified objects, is plenary as to those objects, the power over commerce with foreign nations, and among the several states, is vested in Congress *as absolutely as it would be in a single government, having in its Constitution the same restrictions on the exercise of the power as are found in the Constitution of the United States.*'
* * * * * * * * * * *

"This reference to prior adjudications could be extended if it were necessary to do so. The cases cited, however, sufficiently indicate the grounds upon which this court has proceeded when determining the meaning and scope of the commerce clause. *They show that commerce among the states embraces navigation, intercourse, communication, traffic, the transit of persons, and the transmission of messages by telegraph. They also show that the power to regulate commerce among the several states is vested in Congress as absolutely as it would be in a single government, having in its Constitution the same restrictions on the exercise of the power as are found in the Constitution of the United States; that such power is plenary, complete in itself, and may be exerted by Congress to its utmost extent, subject only to such limitations as the Constitution imposes upon the exercise of the powers granted by it; and that in determining the character of the regulations to be adopted Congress has a large discretion which is not to be controlled by the courts, simply because, in their opinion such regulations may not be the best or most effective that could be employed.*"

Bearing in mind, then, the large significance given to the terms of the commerce clause and the wide scope of the power thereby conferred, let us consider some of those cases, wherein the validity of state statutes is concerned, to which I have referred as more nearly touching the question raised here.

Among them are the following: In Cooley v. Board of Wardens, 53 U. S. 298, 13 L. Ed. 996, under a Pennsylvania statute providing that a vessel which neglects or refuses to take a pilot shall forfeit and pay to the master warden of the pilots, for the use of the Society for the Relief of Distressed and Decayed Pilots, their widows and children, one-half the regular amount of pilotage; in Morgan v. Louisiana, 118 U. S. 455, 6 Sup. Ct. 1114, 30 L. Ed. 637, under statutes of Louisiana establishing a system of quarantine laws; in Smith v. Alabama, 124 U. S. 465, 8 Sup. Ct. 564, 31 L. Ed. 508, under an Alabama statute requiring locomotive engineers to be examined and licensed by a board to be appointed for that purpose; in Nashville, Chattanooga & St. Louis Railway v. Alabama, 128 U. S. 96, 9 Sup. Ct. 28, 32 L. Ed. 352, under an Alabama statute requiring locomotive engineers and other persons employed by a railroad company in a capacity which calls for the ability to distinguish

and discriminate between color signals, to be examined, etc.; in Western Union Telegraph Company v. James, 162 U. S. 650, 16 Sup. Ct. 934, 40 L. Ed. 1105, under a Georgia statute requiring every telegraph company with a line of wires, wholly or partly within that state, to receive dispatches, and, on payment of the usual charges, to transmit and deliver them with due diligence, under a penalty of $100; in Hennington v. Georgia, 163 U. S. 299, 16 Sup. Ct. 1086, 41 L. Ed. 166, under a Georgia statute forbidding the running of freight trains on any railroad in the state on Sunday, and providing for the trial and punishment on conviction of a superintendent of a railroad company violating that provision; in New York, New Haven & Hartford R. R. v. New York, 165 U. S. 628, 17 Sup. Ct. 418, 41 L. Ed. 853, under a New York statute regulating the heating of steam passenger cars, and directing guards and guard posts to be placed on railroad bridges and trestles and the approaches thereto; in Missouri, Kansas & Texas Ry. v. Haber, 169 U. S. 613, 18 Sup. Ct. 488, 42 L. Ed. 878, under a Kansas statute relating to bringing into the state cattle liable to or capable of communicating Texas, splenic, or Spanish fever to any domestic cattle of the state; in Rasmussen v. Idaho, 181 U. S. 198, 21 Sup. Ct. 594, 45 L. Ed. 820, under a Colorado statute relating to the introduction of infectious or contagious diseases among the cattle and horses of that state; in Sherlock v. Alling, 93 U. S. 99, 23 L. Ed. 819, under a statute of Indiana giving a right of action to the personal representatives of the deceased, where his death is caused by the wrongful act or omission of another; in Peirce v. Van Dusen, 78 Fed. 693, 24 C. C. A. 280, 69 L. R. A. 705, under a statute of Ohio for the protection and relief of railroad employés, providing that railroad or railway corporations or companies shall not make certain contracts for exemption from liability to their employés, shall not use defective cars, etc., and to a certain extent abrogating in actions against such companies for personal injuries to employés the rule as to fellow servants; in Martin v. Pittsburg & Lake Erie Ry. Co., supra, under a statute of Pennsylvania providing that when any person should sustain personal injury or loss of life while lawfully engaged or employed on or about the roads, works, depots, and premises of a railroad company or in or about any train or car therein or thereon, of which company such person is not an employé, the right of action and recovery in all such cases against the company shall be such only as would exist if such person were an employé, provided that this section shall not apply to passengers.

In all of these cases the state legislation has been sustained as a valid exercise of the police power of the state, although it may affect interstate commerce, against the contention that it was an invasion of the power given by the Constitution to Congress to regulate interstate commerce. But in all of them the court has been careful to indicate that, as to interstate commerce, Congress also has the power to enact such legislation; that while the power of Congress to regulate such commerce is plenary, it is competent for the states to pass such legislation until Congress acts; and that such state legislation, in so far as it may conflict therewith, must yield to similar legislation by Congress, whenever it chooses to exercise its power.

In M., K. and T. Ry. v. Haber, at page 635 of 169 U. S., at page 496 of 18 Sup. Ct. (42 L. Ed. 878), the court says:

"These cases all proceed upon the ground that the regulation of the enjoyment of the relative rights, and the performance of the duties, of all persons within the jurisdiction of a state, belong primarily to such state under its reserved power to provide for the safety of all persons and property within its limits; and that even if the subject of such regulations be one that may be taken under the exclusive control of Congress and be reached by national legislation, any action taken by the state upon that subject that does not directly interfere with rights secured by the Constitution of the United States or by some valid act of Congress must be respected *until Congress intervenes.*"

In Cooley v. Board of Wardens, after holding that the power to regulate commerce includes the regulation of navigation, and that pilot laws are regulations of navigation, and therefore of commerce, within the grant to Congress of the commercial power, but that the mere grant of the commercial power to Congress does not forbid the states from passing laws to regulate pilotage, the court goes on to say, at page 318 of 53 U. S. (13 L. Ed. 996):

"The grant of commercial power to Congress does not contain any terms which expressly exclude the states from exercising an authority over its subject-matter. If they are excluded, it must be because the nature of the power thus granted to Congress requires that a similar authority should not exist in the states. If it were conceded, on the one side, that the nature of this power, like that to legislate for the District of Columbia, is absolutely and totally repugnant to the existence of similar power in the states. probably no one would deny that the grant of the power to Congress as effectually and perfectly excludes the states from all future legislation on the subject as if express words had been used to exclude them. And, on the other hand, if it were admitted that the existence of this power in Congress, like the power of taxation, is compatible with the existence of a similar power in the states, then it would be in conformity with the contemporary exposition of the Constitution (Federalist, No. 32), and with the judicial construction, given from time to time by this court, after the most deliberate consideration, to hold that the mere grant of such a power to Congress did not imply a prohibition on the states to exercise the same power; that it is not the mere existence of such a power, *but its exercise by Congress,* which may be incompatible with the exercise of the same power by the states, and that the states may legislate *in the absence of congressional regulations.*"

In Nashville, Chattanooga & St. L. Ry. v. Alabama, at page 99 of 128 U. S., at page 28 of 9 Sup. Ct. (32 L. Ed. 352), the court says:

"It is conceded that the power of Congress to regulate interstate commerce is plenary; that, as incident to it, Congress may legislate as to the qualifications, duties, and *liabilities* of employés and others on railway trains engaged in that commerce, and that such legislation will supersede any state action on the subject. *But until such legislation is had* it is clearly within the competency of the states to provide against accidents on trains whilst within their limits."

In New York, New Haven & Hartford R. R. v. New York, the court said, at page 631 of 165 U. S., at page 419 of 17 Sup. Ct. (41 L. Ed. 853):

"According to numerous decisions of this court (some of which are cited in the margin) sustaining the validity of state regulations enacted under the police powers of the state, and which incidentally affected commerce among the states and with foreign nations, it was clearly competent for the state of New York, *in the absence of national legislation covering the subject,* to for-

bid, under penalties, the heating of passenger cars in that state, by stoves or furnaces kept inside the cars or suspended therefrom, although such cars may be employed in interstate commerce. While the laws of the states must yield to acts of Congress passed in execution of the powers conferred upon it by the Constitution (Gibbons v. Ogden, 9 Wheat. 1, 211, 6 L. Ed. 23), the mere grant to Congress of the power to regulate commerce with foreign nations and among the states did not of itself *and without legislation by Congress*, impair the authority of the states to establish such reasonable regulations as were appropriate for the protection of the health, the lives, and the safety of their people."

It may be urged that the cases above quoted from, and some of the others cited, do not directly bear upon the question which we have here. But the cases of Sherlock v. Alling, Peirce v. Van Dusen, and Martin v. Pittsburg & Lake Erie R. R. Co., supra, do bear directly upon that question, and in my judgment completely decide it; each of them being a case in which the statute changed the common-law rule of liability.

It would seem to be a little remarkable that in these three cases, as well as in the others, all of which arose before Congress had seen fit to take any action on the subject, the validity of such legislation by the states, where it affected common carriers engaged in interstate commerce, was assailed on the ground that it did regulate interstate commerce, and was therefore an invasion of the power of Congress over that subject, while now, since Congress has acted, in a statute whose provisions apply only to those engaged in interstate commerce, the opposite contention is made. In Sherlock v. Alling it was contended, quoting from the opinion at the bottom of page 101 of 93 U. S. (23 L. Ed. 819):

"That the statute of Indiana creates a new liability, and could not, therefore, be applied to cases where the injuries complained of were caused by marine torts, without interfering with the exclusive regulation of commerce vested in Congress. The position of the defendants, as we understand it, is that as by both the common and maritime law the right of action for personal torts dies with the person injured, the statute which allows actions for such torts, when resulting in the death of the person injured, to be brought by the personal representatives of the deceased, enlarges the liability of parties for such torts, and that such enlarged liability, if applied to cases of marine torts, would constitute a new burden upon commerce."

After referring to the cases in which state legislation had been held invalid because directly imposing a tax or burden upon interstate commerce, and after holding that no such operation could be ascribed to the Indiana statute, the court, speaking by Mr. Justice Field, at page 103 of 93 U. S. (23 L. Ed. 819), goes on to say:

"That statute imposes no tax, prescribes no duty, and in no respect interferes with any regulations for the navigation and use of vessels. It only declares a general principle respecting the *liability* of all persons within the jurisdiction of the state for torts resulting in the death of parties injured. And in the application of the principle it makes no difference where the injury complained of occurred in the state, whether on land or on water. General legislation of this kind, prescribing the *liabilities* or duties of citizens of a state, without distinction as to pursuit or calling, is not open to any valid objection, *because it may affect persons engaged in foreign or interstate commerce*. Objection might with equal propriety be urged against legislation prescribing the form in which contracts shall be authenticated, or property descend or be distributed on the death of its owner, because applicable to the

contracts or estates of persons engaged in such commerce. In conferring upon Congress the regulation of commerce, it was never intended to cut the states off from legislating on all subjects relating to the health, life, and safety of their citizens, *though the legislation might indirectly affect the commerce of the country.* Legislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it, within the meaning of the Constitution.

"*It is true that the commercial power conferred by the Constitution is one without limitation. It authorizes legislation with respect to all the subjects of foreign and interstate commerce, the persons engaged in it, and the instruments by which it is carried on.* And legislation has largely dealt, so far as commerce by water is concerned, with the instruments of that commerce. It has embraced the whole subject of navigation; prescribed what shall constitute American vessels, and by whom they shall be navigated; how they shall be registered or enrolled and licensed; to what tonnage, hospital, and other dues they shall be subjected; what rules they shall obey in passing each other; *and what provisions their owners shall make for the health, safety, and comfort of their crews.* Since steam has been applied to the propulsion of vessels, legislation has embraced an infinite variety of further details, to guard against accident and consequent loss of life.

"The power to prescribe these and similar regulations necessarily involves the right to declare the liability which shall follow their infraction. *Whatever, therefore, Congress determines, either as to a regulation or the liability for its infringement, is exclusive of state authority.* But with reference to a great variety of matters touching the rights and liabilities of persons engaged in commerce, either as owners or navigators of vessels, *the laws of Congress are silent,* and the laws of the state govern. The rules for the acquisition of property by persons engaged in navigation, and for its transfer and descent, are, with some exceptions, those prescribed by the state to which the vessels belong; and it may be said generally that the legislation of a state not directed against commerce or any of its regulations, but relating to the rights, duties, and liabilities of citizens, and only indirectly and remotely affecting the operation of commerce, is of obligatory force upon citizens within its territorial jurisdiction, whether on land or water or engaged in commerce, foreign or interstate, or in any other pursuit. In our judgment, the statute of Indiana falls under this class. *Until Congress, therefore, makes some regulation touching the liability of parties for marine torts resulting in the death of the persons injured, we are of opinion that the statute of Indiana applies,* giving a right of action in such cases to the personal representatives of the deceased, and that, as thus applied, it constitutes no encroachment upon the commercial power of Congress."

In Peirce v. Van Dusen, the Circuit Court, composed of Mr. Justice Harlan and Judges Taft and Lurton, had under consideration the Ohio statute which changed or modified the fellow servant rule, thus, as is contended here, creating a liability which did not theretofore exist. It is true that the principal question before the court was whether the statute of Ohio was applicable to cases against a receiver of a railroad corporation, especially one acting under the orders of a federal court; but the court went on to consider its applicability to railroad companies doing business in Ohio and engaged in interstate commerce (the railroad company in that case being so engaged) and the question of its validity arising from the fact that it thus affected such commerce. Speaking by Mr. Justice Harlan, the court says, at page 698 of 78 Fed., at page 284 of 24 C. C. A. (69 L. R. A. 705):

"So much as to the scope and true meaning of the Ohio statute, without reference to the courts in which it may be enforced. If the statute means what we hold it to mean, must not full effect be given to it in actions for personal injuries brought against a receiver in a court of the United States? This question must be answered in the affirmative. Such legislation is not liable

to the objection that it encroaches upon federal authority, or upon the jurisdiction or power of the United States court. The statute does nothing more than to prescribe a rule of action to be observed by all within the state. The authority to enact it is derived from the general power of the state to regulate the exercise of the relative rights and duties, and to provide for the safety, of all persons within its territorial jurisdiction. It is the duty of the federal court sitting in this state to enforce all enactments having such objects in view, unless they encroach upon the powers and authority of the United States. That duty arises out of the statute declaring that 'the laws of the several states, except where the Constitution, treaties, or statutes of the United States otherwise require or provide, shall be regarded as rules of decision in trials at common law in the courts of the United States, in cases where they apply.' Rev. St. § 721; Baltimore & O. R. Co. v. Camp, 31 U. S. App. 213, 13 C. C. A. 233, and 65 Fed. 952. Indeed, if Congress had not so declared, this court, upon principles of comity, and in support of the public policy of the state, might well recognize and enforce, in actions brought against receivers of railroads, any rules established by the state for like actions brought against railroad companies.

"The Ohio statute is not applicable alone to railroad corporations of Ohio engaged in the domestic commerce of this state. It is equally applicable to railroad corporations doing business in Ohio *and engaged in commerce among the states*, although the statute, in its operation, *may affect in some degree a subject over which Congress can exert full power.* The states may do many things affecting commerce with foreign nations and among the several states *until Congress covers the subject by national legislation.*"

Then, after citing and commenting upon many of the cases which I have above cited, the court says, at page 700 of 78 Fed., at page 286 of 24 C. C. A. (69 L. R. A. 705):

"*Undoubtedly, the whole subject of the liability of interstate railroad companies for the negligence of those in their service may be covered by national legislation enacted by Congress under its power to regulate commerce among the states. But as Congress has not dealt with that subject*, it was competent for Ohio to declare that an employé of any railroad corporation doing business here, including those engaged in commerce among the states, shall be deemed, in respect to his acts within this state, the superior, not the fellow servant, of other employés placed under his control. If the effect of the Ohio statute be, as undoubtedly it is, to impose upon such corporations, in particular circumstances, a liability for injuries received by some of its employés which would not otherwise rest upon them according to the principles of general law, that fact does not release the federal court from its obligation to enforce the enactments of the state. Of the validity of such state legislation we entertain no doubt."

It is difficult to understand why, if Congress may regulate the liability of common carriers engaged in interstate commerce to strangers, it may not regulate their liability to their employés; the protection of interstate commerce and of the persons engaged therein being as much involved in the one case as in the other.

In the case of Martin v. Pittsburg & Lake Erie R. R. Co., the court had under consideration the Pennsylvania statute whose provisions have been given above. The plaintiff, Martin, was injured while he was on a train of the railroad company, in the employ of the United States as a railway postal clerk on a route extending from Cleveland, Ohio, to Pittsburg, Pa. The injuries arose from the derailing in Pennsylvania of the train by the negligence of the crew of a work train in permitting a switch leading to a side track to be open. The defendant, among other defenses, pleaded the law of Pennsylvania above referred to and alleged that it was applicable and relieved from

responsibility. In reply the plaintiff denied the existence and applica-, bility of the statute, and further contended that the statute if existing and applicable was void, first, because contrary to the power delegated to Congress to establish post offices and post roads; second, because repugnant to the commerce clause of the Constitution; and, third, because in conflict with the equal protection and due process clauses of the fourteenth amendment, and also the clause prohibiting a state from making or enforcing any law which shall abridge the privileges or immunities of citizens of the United States. On the trial before a jury the court held the statutes to be applicable and valid, and hence operative to defeat a recovery. There was a verdict and judgment in favor of the defendant, which was severally affirmed by the Circuit Court and by the Supreme Court of the state of Ohio. The Supreme Court of the United States also affirmed the judgment, holding the statute to be applicable and valid. After disposing of the first contention, the court went on to consider the second contention as to the repugnancy of the statute to the commerce clause of the Constitution, and, speaking by Mr. Justice White, said:

"This brings us to the second contention—the repugnancy of the Pennsylvania statute to the commerce clause of the Constitution. It is apparent from the decision in the Price Case, just previously referred to, that in deciding that question we must determine the application of the statute to the plaintiff in error, wholly irrespective of the fact that at the time he was injured he was a railway postal clerk. In other words, the validity or invalidity of the statute is to be adjudged precisely as if the plaintiff was, at the time of the injury, serving for hire in the employment of a private individual or corporation.

"Under the circumstances we have stated, the case of Pennsylvania R. R. Co. v. Hughes, 191 U. S. 477, 24 Sup. Ct. 132, 48 L. Ed. 268, clearly establishes the unsoundness of the contention that the Pennsylvania statute in question was void because in conflict with the commerce clause. In that case a horse was shipped from a point in the state of New York to a point in the state of Pennsylvania, under a bill of lading which limited the right of recovery to not exceeding $100 for any injury which might be occasioned to the animal during the transit. The horse was hurt within the state of Pennsylvania through the negligence of a connecting carrier. In the courts of Pennsylvania, applying the Pennsylvania doctrine which denies the right of a common carrier to limit its liability for injuries resulting from negligence, a recovery was had in the sum of $10,000, the value of the animal. On writ of error from this court the judgment of the Supreme Court of Pennsylvania was affirmed; it being held that, at least, *in the absence of legislation by Congress on the subject*, the effect of the commerce clause of the Constitution was not to deprive the state of Pennsylvania of authority to legislate as to those within its jurisdiction concerning *the liability* of common carriers, *although such legislation might, to some extent, indirectly affect interstate commerce.* The ruling in the Hughes Case in effect but reiterated the principle adopted and applied in Chicago, M. & St. P. R. R. Co. v. Solan, 169 U. S. 133, 18 Sup. Ct. 289, 42 L. Ed. 688, *where an Iowa statute forbidding a common carrier from contracting to exempt itself from liability was sustained as to a person who was injured during an interstate transportation.*

"The contention that because, in the cases referred to, the operation of the state laws which were sustained was to augment the liability of a carrier, therefore the rulings are inapposite here, where the consequence of the application of the state statute may be to lessen the carrier's liability, rests upon a distinction without a difference. The result of the previous rulings was to recognize, *in the absence of action by Congress*, the power of the states to legislate, and of course this power involved the authority to regulate as the state might deem best for the public good, without reference to whether the

effect of the legislation might be to limit or broaden the responsibility of the carrier. In other words, the assertion of federal rights is disposed of when we determine the question of power, and doing so does not involve considering the wisdom with which the lawful power may have been under stated conditions exerted. * * *

"The contention that because plaintiff in error, as a citizen of the United States, had a constitutional right to travel from one state to another, he was entitled, as the result of an accident happening in Pennsylvania. to a cause of action not allowed by the laws of the state, is in a different form to reiterate that the Pennsylvania statute was repugnant to the commerce clause of the Constitution of the United States. Conceding, if the accident had happened in Ohio, there would have been a right to recover, that fact did not deprive the state of Pennsylvania of its authority to legislate so as to affect persons and things within its borders. The commerce clause not being controlling *in the absence of legislation by Congress*, it follows, of necessity, that the plaintiff in error, as an incident of his right to travel from state to state, did not possess the privileges, as to an accident happening in Pennsylvania, to exert a cause of action not given by the laws of that state, and had no immunity exempting him from the control of the state legislation."

In the case of Pennsylvania R. R. Co. v. Hughes, referred to in the opinion of Mr. Justice White, above quoted, the court says, at page 491 of 191 U. S., at page 136 of 24 Sup. Ct. (48 L. Ed. 268):

"It is true that this language was used of a statute of Iowa enacting a rule of obligation for common carriers in that state. But the principle recognized is that, *in the absence of Congressional legislation upon the subject, a state may require a common carrier, although in the execution of a contract for interstate carriage, to use great care and diligence in the carrying of passengers and transportation of goods, and to be liable for the whole loss resulting from negligence in the discharge of its duties.*

"*We can see no difference in the application of the principle based upon the manner in which the state requires this degree of care and responsibility, whether enacted into a statute or resulting from the rules of law enforced in the state courts.* The state has a right to promote the welfare and safety of those within its jurisdiction by requiring common carriers to be responsible to the full measure of the loss resulting from their negligence, a contract to the contrary notwithstanding. This requirement in the case just cited is held. *in the absence of Congressional action providing a different measure of liability* when contracts, such as the one now before us, are made in relation to interstate carriage. Its pertinence to the case under consideration renders further discussion unnecessary."

In C., M. & St. P. Ry. Co. v. Solan, 169 U. S. at page 137, 18 Sup. Ct. at page 291 (42 L. Ed. 688) the court says:

"They are not, *in themselves*, regulations of interstate commerce, although they control, in some degree, the conduct and the liability of those engaged in such commerce. *So long as Congress has not legislated upon the particular subject*, they are rather to be regarded as legislation in aid of such commerce, and as a rightful exercise of the police power of the state to regulate the relative rights and duties of all persons and corporations within its limits."

The effect of these decisions and of all those cited above, as I understand them, is that such legislation as that considered and reviewed therein may not be, and is not necessarily and in and of itself, a regulation of commerce, but that it may be adopted as such, and that Congress can enact such legislation as a regulation of interstate commerce. And in the decisions from which I have so fully quoted the court recognizes and declares, if the language means anything, that Congress has power under the commerce clause of the Constitution

to enact such legislation as that here under consideration, changing as to common carriers engaged in interstate commerce common-law rules of liability, as a regulation of interstate commerce.

It is contended that the portions of the opinions which I have emphasized are obiter dicta. If they are, it is strange, indeed unfortunate, that the eminent judges of our highest court should so often fall into such dicta. But they are not obiter dicta. The question of the invasion by the state legislation of the power of Congress under the commerce clause of the Constitution was necessarily involved therein, and if such legislation was a mere creation of a liability, and was for that reason not a regulation of commerce, and therefore not within the power of Congress, as is contended here, it is difficult to understand why the court did not so declare, and thus dispose of the cases. If the power to enact such legislation is in the state Legislatures only, and not in Congress, the court had only to say so, and it was unnecessary to so elaborately discuss that question. By doing so, and by saying what they did, they recognized that the question of the power of Congress was involved in the cases, and they recognized and declared that such legislation is within the power conferred by the commerce clause.

Nor are these cases to the effect that the power of Congress can only be exerted by prescribing that some particular thing shall be done. And it would seem to be apparent that this act is none the less a rule or regulation under which the business of such carriers is to be conducted and by which it is to be governed, because it does not prescribe that some specific thing should be done or some specific appliance used.

In Johnson v. Southern Pacific Co., 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363, the court had under consideration the act of Congress known as the "Safety Appliance Act" of March 2, 1893 (27 Stat. 531, c. 196 [U. S. Comp. St. 1901, p. 3174]), requiring railroads engaged in interstate commerce to equip their locomotives, trains, and cars with air brakes, automatic couplers, etc. The plaintiff claimed that he was relieved of assumption of risk under common-law rules by section 8 of that act, which provided:

"That any employee of any such common carrier who may be injured by any locomotive, car, or train in use contrary to the provision of this act shall not be deemed thereby to have assumed the risk thereby occasioned, although continuing in the employment of such carrier after the unlawful use of such locomotive, car, or train had been brought to his knowledge."

That this act was squarely within the power of Congress under the commerce clause of the Constitution was not questioned. And that, in connection with such a regulation as that requiring the use of such appliances, Congress had the power, under the commerce clause of the Constitution, to change the common-law rule as to the assumption of risk, seems to have been thought too clear for argument. In that case the court said:

"The object was to protect the lives and limbs of railroad employés by rendering it unnecessary for a man operating the couplers to go between the ends of the cars, and that object would be defeated, not necessarily by the use of automatic couplers of different kinds, but if those different kinds would not automatically couple with each other."

And again:

"The primary object of the act was to promote the public welfare by securing the safety of employés and travelers."

The court here recognizes that the public welfare, as involved in interstate commerce, may be promoted by legislation of Congress for the protection of persons employed in carrying it on.

While the act here under consideration does not state either in its title or body, as did that act, what the object of it is, it seems to me that such object is plain upon its face. It will be apparent, I think, from a mere reading of the statute, that Congress had in contemplation much more than the mere creation and imposition of the liability mentioned upon common carriers engaged in interstate commerce to their employés. It seems to me to be apparent that it had in contemplation the protection of the lives and persons of the employés of such carriers whose employment had any relation to such commerce, and that it enacted the statute for that purpose, and by its provisions changed certain common-law rules determining liability in order to promote that object by securing a more careful selection of employés, a closer and more careful supervision of them, and a more rigid enforcement of their duties, and thus to promote the public welfare.

In Mikkelson v. Truesdale, 65 N. W. 260, 63 Minn. 137, the Supreme Court of Minnesota had under consideration the state statute entitled "An act to define the liabilities of railroad companies in relation to damages sustained by their employés." Neither in the title nor in the body of the act was anything said as to its object, but the court said that it was—

"a police regulation intended to protect life, person, and property by securing a more careful selection of servants and a more rigid enforcement of their duties by railroad companies, by making them pecuniarily responsible to those of their servants who are injured by the negligence of incompetent or careless fellow servants."

Now, if Congress has power, as a regulation of commerce, having in view the promotion of the public welfare by securing the safety of employés and travelers, to pass an act like the safety appliance act, requiring the use of specific appliances, and can in connection therewith and to promote the objects of the statute change the common-law rule as to the assumption of risk, has it not power as a regulation of commerce to pass such an act as the one we are here considering?

Must Congress be obliged, in order to bring its legislation within the commerce clause of the Constitution, to provide specifically and definitely for all the conditions that may exist and for all of the almost infinite situations and circumstances that may arise affecting the safety of employés in the conduct of the business of common carriers? Must it specifically and definitely provide what precautions should be taken for the safety of employés under all such conditions and in all these almost innumerable situations? Can it not say generally, as it has, in effect, said in this act: "We cannot anticipate all of these conditions and situations. We cannot provide for all the precautions which ought to be taken for the safety of employés by common carriers engaged in interstate commerce. But in order to secure, under all conditions and in all

situations, a more diligent and thorough performance of the duties of such carriers, and in order to compel and insure that every proper precaution shall be taken for the safety of their employés both as to the agencies and instrumentalities used and as to the selection and supervision of such employés, and in order to minimize as far as possible the dangers to such employés, we will not permit such carriers, in case of the death or injury of an employé resulting from their negligence or the negligence of any of their servants, to invoke certain common-law rules for the purpose of escaping liability, but they shall be governed by and their liability shall be ascertained by the rules herein land down." May not Congress say, as it has, in effect, said in this act, we declare that interstate commerce, including those engaged therein and the public to be served thereby, must be safe-guarded by the rules of liability herein prescribed and that such commerce must bear the burden hereby imposed? It seems to me there can be but one answer to these questions; and that is, that Congress need not provide specifically and definitely for all such conditions and situations, and that it has power under the commerce clause to pass such an act.

Undoubtedly, if Congress may prescribe specific rules, it may prescribe general rules, and may prescribe the consequences which shall follow in case of a violation of either. There is no suggestion in the Constitution or in reason to the contrary. The field belongs to Congress, and it may, if it sees fit, occupy all of it. Congress has by the statute here in question, in effect, said: "The employés of those engaged in interstate commerce are too frequently placed in peril of life and limb through the negligence of their employers and through the negligence of their own fellow servants. Such commerce itself is subject to unnecessary hazards for the same reason. This must be prevented, or at least reduced to a minimum. The negligence of fellow servants is in large measure under the control of the employers, if the latter but exercise proper care in the selection of such servants and in their supervision and require of them the performance of tasks only which will impose reasonable tests upon their skill or powers of endurance. Increasing the liability of the employer will tend to decrease those perils and hazards. The duties of such carriers as declared by the courts and as prescribed by particular statutes are well known and understood, and such duties must be more faithfully performed, and such carriers must see to it that greater precautions are taken to safeguard such commerce and to protect their employés engaged therein, and in order to secure this the rules of their liability shall be as herein provided."

If it be contended that the creation of such liabilities is an exercise of the police power, and that such power belongs to the states, the answer is that while, as a general rule, the police power belongs to the states, and was by the Constitution reserved to the states, yet Congress may, in the exercise of its power to regulate commerce, impose upon such commerce regulations which are in their essential nature police regulations. Upon no other theory can the decisions in Johnson v. Southern Pacific Co., supra, and in Lottery Cases, supra, be justified and sustained.

I am therefore of the opinion that the first ground on which the constitutionality of this act is denied is not well taken.

The second ground on which the constitutionality of the act is attacked is: *That, if it be admitted that the act does regulate interstate commerce, it also regulates commerce that is exclusively within the several states, and that the latter is so inseparably combined with the former as to condemn the whole act as unwarranted by the Constitution.* The contention, as I understand it, is that a common carrier engaged in interstate commerce may be engaged in intrastate commerce also, and the language of the act being so broad as to cover all the employés of such carrier, without reference to the nature of their employment, it is not only a regulation of interstate commerce, but also a regulation of intrastate commerce, and as it is impossible to so construe it as to separate the two it must be held invalid.

This contention is, I think, answered by what I have already said, and by the decisions to which I have referred, and others to which I shall call attention. It is well to recall the familiar rule that, while it is an imperative duty from which no court should shrink to declare void any statute the unconstitutionality of which is made apparent, due regard to the boundary between the legislative and the judicial departments of the government requires that this duty should be exercised with the greatest caution. Under this rule, where under one construction a statute may be invalid, if there is another reasonable construction which would sustain its validity, the latter should be adopted. Am. and Eng. Ency. of Law (Old Edition) vol. 3, p. 674, note and cases there cited. If, therefore, it were necessary to sustain its validity that this act should be so construed as to confine its operation to those whose injuries occurred at a time when they were actually engaged upon interstate traffic, I think that, having in view its object, there is ample authority for such construction. And the courts, giving it such construction, should determine from the facts and circumstances of each particular case whether or not it is applicable. Even in the Johnson Case, where the act under consideration was not wholly remedial, the Supreme Court refused to give it an absolutely strict construction, as had been done by the Circuit Court of Appeals. The act here under consideration is not penal, but may be regarded as wholly remedial, and as such would not only permit, but require, a wider latitude of construction. It would seem to be absurd to say that, where Congress has enacted a statute of a remedial nature, it must be held unconstitutional, because, while it might be construed to apply to a subject clearly within the control of Congress, it might also be construed to apply to something not within such control.

But it is not necessary to so narrowly construe the act in order to sustain its validity. It should be fairly and reasonably construed (Church of The Holy Trinity v. U. S., 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226), having in view its object, and bearing in mind that it is *the carrier engaged in interstate commerce* which the act seeks to regulate in relation to its duty to its employés. From a mere reading of the act, it will be apparent that no argument is necessary to show that the expression "any common carriers," in the second section of the act, means "any common carriers engaged in interstate or foreign commerce."

Congress evidently intended that the act should embrace all the employés to whom its power under the commerce clause of the Constitution extends, and if the power of Congress over interstate commerce is one without limitation, plenary and complete in itself, and which may be exerted to its utmost extent, subject *only* to such limitations as the Constitution of the United States imposes, and if it authorizes legislation with respect to all the subjects of foreign and interstate commerce, the persons engaged in it, and the instruments by which it is carried on; and if under such power Congress can, for the purpose of promoting the safety of employés engaged therein, and of persons and property carried therein, enact legislation such as that contained in this act under which the liability of carriers engaged in such commerce to their employés shall be determined (and the cases cited fully sustain all the foregoing propositions), it would seem to be apparent that it can make such legislation applicable to all employés of such carriers whose employment relates to such commerce. And if such carrier is also engaged in intrastate commerce, using therein the same means and agencies, such as railroad tracks, switches, cars, etc., it would also seem to be apparent that Congress can make such legislation applicable to all employés of such carrier whose employment relates to such means and agencies. In such case it may be said that the employment of such employés relates to interstate commerce.

It seems to me that, as to a carrier engaged in both interstate and intrastate commerce, the act applies, and was intended to apply, where such carrier uses, in whole or in part, the same means and agencies in both, and where the employment of the injured employé has some relation to such interstate commerce or to such means and agencies.

If the carrier's business is carried on in such a way that the act must apply to *all* its employés for the reason that the employment of all of them relates to interstate commerce, it can make no difference, so far as the power of Congress to pass the act is concerned.

That it is within the power of Congress to regulate the liability of common carriers engaged at the same time in both interstate and intrastate commerce, and using the same means and agencies for both, to all their employés whose employment has some relation to such means and agencies, and that Congress so intended, would seem to be apparent when we reflect that the safety of interstate commerce, and the protection of the lives and persons of those engaged therein, and of the persons and property carried therein, may depend as much upon the taking of proper precautions for the safety of employés engaged upon intrastate traffic as upon the taking of such precautions for the safety of those engaged upon interstate traffic only.

Let us suppose that such carrier has commingled in a train, cars containing state traffic only with those containing interstate traffic, and that while engaged on such train a brakeman is injured while setting a brake on one of the cars containing only state traffic; or, again, that such carrier has a yard in which are handled both cars containing only state traffic and those containing interstate traffic, and that while handling a car containing only state traffic a switchman is injured; or, again, that such carrier is operating, on its line of road on which trains containing interstate traffic are operated, a train made up entirely of

cars containing only intrastate traffic, and that on such train a brakeman is injured. Could it be said, in either of such cases, that the employment of such brakeman or switchman had no relation to interstate commerce, and that he was not within the spirit and object and purpose of the statute? And could it be said that a careful selection of such employés, a close and careful supervision of them, and a rigid enforcement of their duties, and the taking of proper precautions for their safety were not of vital importance in securing the safety of life, person, and property in interstate commerce?

It may be well, in this connection, to call attention to what Mr. Justice Brewer, in Baltimore & Ohio Railroad v. Baugh, 149 U. S. 368, 378, 13 Sup. Ct. 914, 918 (37 L. Ed. 772) says. After referring to the authorities holding that the question of the liability of a railroad company for injuries to its servants is a matter of general and not of local law, which the court would, in the absence of express statute on the subject, determine for itself, he continues:

"* * * There is no question as to the power of the states to legislate and change the rules of the common law in this respect as in others; but, in the absence of such legislation, the question is one determinable only by the general principles of that law. Further than that, it is a question in which the Nation as a whole is interested. It enters into the commerce of the country. Commerce between the states is a matter of national regulation, and to establish it as such was one of the principal causes which led to the adoption of our Constitution. To-day the volume of interstate commerce far exceeds the anticipation of those who framed the Constitution, and the main channels through which this interstate commerce passes are the railroads of the country. Congress has legislated in respect to this commerce not merely by the interstate commerce act and its amendments (24 Stat. 379, c. 104 [U. S. Comp. St. 1901, p. 3154]), but also by an act passed at the last session, requiring the use of automatic couplers on freight cars (Pub. Acts, 52d Cong., 2d Sess., c. 113). The lines of this very plaintiff in error extend into half a dozen or more states, and its trains are largely employed in interstate commerce. As it passes from state to state, must the rights, obligations, and duties subsisting between it and its employés change at every state line? If to a train running from Baltimore to Chicago it should, within the limits of the state of Ohio, attach a car for a distance only within that state, ought the law controlling the relation of a brakeman on that car to the company to be different from that subsisting between the brakeman on the through cars and the company?"

It would seem to be clear that it is of the first importance that Congress should be able to regulate the liability of such common carrier to all such employés.

The fact that a common carrier engaged in interstate commerce may also be engaged in intrastate commerce, using therein in whole or in part the same means and agencies, cannot defeat the power of Congress to regulate such carrier. The regulation of intrastate commerce which may result in such a case (if, indeed, in such case there can be said to be any regulation of intrastate commerce by such an act as this) is due to the fact that the carrier is at the same time and with the same means and agencies engaged in both kinds of commerce; and it seems to me that it could not possibly be said that, because the legislation of Congress may operate upon intrastate commerce on account of the carrier being thus engaged in both kinds of commerce, it must be declared unconstitutional, and thus the power of Congress defeated. The cases

cited show that the states may enact legislation of the kind here in question when Congress has not already spoken, and that such legislation will be valid, although it may affect interstate commerce.   Is it possible, then, if such legislation is within the power of Congress as a regulation of interstate commerce, that Congress cannot exercise that power as to those engaged in such commerce merely, because at the same time and with the same means and agencies they are engaged in intrastate commerce?   The question, it seems to me, answers itself.

In considering what was said in Johnson v. Southern Pacific Company, supra, as to the character of the car being local only, and not actually engaged in interstate movement, it must be borne in mind that the act there being considered was that of March 2, 1893, which was by its terms restricted in its application to cars "used in moving interstate traffic"; but there are clauses and expressions in the opinion which might be interpreted to indicate that, if the act had been as broad as the one here under consideration, it would not have been necessary to consider that question at all, and that it would have made no difference as to whether the car was being used in moving interstate traffic or not.

The act was amended by the act of March 2, 1903 (32 Stat. 943, c. 976 [U. S. Comp. St. Supp. 1905, p. 603]), which provided that the provisions of the former act should be held to apply to "all trains, locomotives, tenders, cars, and similar vehicles *used on any railroad engaged in interstate commerce."*

In U. S. v. Great Northern Ry. Co., (D. C.) 145 Fed. 438, the court had under consideration the latter act, and Judge Whitson, in an opinion in which I entirely concur, held that it applied to all cars regularly used on any railroad engaged in interstate commerce, not only while actually in use in such commerce, but at all times when in use on such road. The court said:

"The allegations of the sixth cause of action are that the defendant used on its line of railroad in Hillyard, in the state of Washington, a locomotive engine in moving a car containing interstate traffic, consigned from St. Cloud, in the state of Minnesota, to Hillyard, in the state of Washington, when the coupling and uncoupling apparatus of the locomotive was out of repair and inoperative.  The sufficiency of these several allegations is challenged upon the sole ground that it does not affirmatively appear that the cars and locomotive were being used in interstate traffic, for the reason that reliance must be made upon the allegations that they were used only in the state of Washington.  Having reference to the constitutional powers of Congress, the argument is that a common carrier is not affected by the legislation which the plaintiff would invoke, because it does not apply to traffic within the states.

"The title of the act of 1893 fully reflects the legislative intent as expressed in the act, and it is manifest that the purpose in view was the regulation of commerce between the states by requiring common carriers to conform to certain requirements regarded as essential to the safety of employees and passengers.  To sustain the demurrer would be to hold that it is beyond the power of Congress to control the instrumentalities through which interstate commerce may be carried on.  But the prerogative necessarily carries with it the authority to prescribe the rules and regulations which shall apply to those engaged in it.  Illustrations of the futility of any effort on the part of Congress to exercise its constitutional powers in this regard, if the contention made by the defendant can be sustained, are not far to seek.  An interstate carrier might haul traffic from one state to another, there transfer it, and from thence transport it, without any of the safety appliances provided by law.  If it be answered that this would be an evasion of the law, the result

is susceptible of further illustration. Cars containing state traffic could be commingled with those containing interstate traffic, and thus defeat the purposes of the legislation upon the subject. The effect of this would be to endanger the train engaged in interstate traffic. Again, a carrier could use trains engaged entirely in state traffic upon its lines, without the requisite equipment, which might result in injury to passengers by coming in collision with a train engaged in interstate traffic. *It is the carrier which the acts seek to regulate, and it is by this method that Congress has undertaken to bring the matter under control.*"

As said by Mr. Justice Harlan, in the Lottery Case, supra:

"It is to be remarked that the *Constitution does not define what is to be deemed a legitimate regulation of interstate commerce.* In Gibbons v. Ogden it was said that the power to regulate such commerce is the power to prescribe the rule by which it is to be governed. But this general observation leaves it to be determined, when the question comes before the court, whether Congress in prescribing a particular rule has exceeded its power under the Constitution. While our government must be acknowledged by all to be one of enumerated powers (McCulloch v. Maryland, 4 Wheat. 316, 405, 407, 4 L. Ed. 579), the Constitution does not attempt to set forth all the means by which such powers may be carried into execution. It leaves to Congress a large discretion as to the means that may be employed in executing a given power. 'The sound construction of the Constitution,' this court has said, 'must allow to the national Legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the Constitution, are constitutional.' 4 Wheat. 421."

In an able article on the act here in question in the Central Law Journal of October 12, 1906, vol. 63, p. 284, cited by counsel here, and very largely quoted from, the authors say:

"The general and sweeping terms 'every common carrier,' 'any of its employés,' 'any of its officers, agents. or employés,' 'all instrumentalities,' 'any common carriers,' and 'any employé,' must establish the proposition that there was but one idea in the mind of Congress, namely, that as to commerce there shall be no states."

To say that because Congress, as a regulation of interstate commerce, and for the purpose of promoting the public welfare by protecting life and person therein, has seen fit to abolish or modify certain rules of decision founded on the common law upon considerations of public policy, in reference to those engaged in such commerce, it has thereby in effect meant that as to commerce there shall be no states, seems to me to be very extreme, if not absurd. The plain answer to any such assertion is that a person or corporation engaged in both interstate commerce and intrastate commerce, and using therein the same means and agencies, and employing those whose employment relates to such interstate commerce or to such means and agencies, must submit to such conditions as that branch of the government to which plenary power over such commerce has been given by the Constitution may prescribe, even though such conditions may affect the intrastate commerce in which such person or corporation is engaged.

In the same article its authors seem to look upon the changes made by this act in the fellow servant rule, the contributory negligence rule, the rule as to the freedom of a carrier to contract with its em-

ployés concerning its liability for an injury to an employé, and the removal of the limit to the amount of recovery for an injury resulting in death, so often prescribed by state statutes, as startling and dangerous. They do not so impress me. I think it has come to be generally recognized that the reasoning of the cases in which the fellow servant rule has been laid down by the courts has, in view of modern methods and the many dangerous mechanical means and appliances used in almost every branch of modern industry, lost much, and in some cases all, of its force. I think it may be fairly asserted that the contributory negligence rule, as laid down and applied by the courts, is, in view of modern conditions, certainly as applied to those engaged in certain occupations, a harsh, cruel, and unjust rule, and ought long since in the furtherance of justice and in the interest of humanity to have been greatly modified.

It has never been the rule in admiralty, to which one of the textbooks on the Law of Negligence refers as being certainly nearer ideal justice, "if juries could be trusted to act upon it." This act at least leads in the direction of the admiralty law, and certainly, if a rule is an ideal one, its adoption should be striven for in any intelligent judicial system, and even if it were admitted that juries could not be trusted to act upon it, to which I do not at all agree, that would not be a condemnation of the rule, but of a part of that system of jurisprudence which has come down from our forefathers, and which is, and let us devoutly hope always will be, firmly rooted in our Constitution and laws. And is it not absurd that a common maximum standard should be established to measure the value of the lives of men to their families, especially when that standard is as low as some of the Legislatures have fixed it? It would seem that the value of the life of a man to his family, or to those dependent upon him, should be determined, as all other damages are determined, by the particular circumstances of each case. And there are substantial reasons why an employer, especially one engaged in certain occupations, should not be permitted to relieve himself by contract with his employés from liability for injuries caused by his negligence or the negligence of his other employés.

I do not think that the Trade-Mark Cases, 100 U. S. 82, 25 L. Ed. 550, or Illinois Central Railroad Company v. McKendree, 27 Sup. Ct. Rep. 153, 203 U. S. 514, 51 L. Ed. ——, or any of that line of cases are applicable to the question now under consideration. This opinion is already too long, and I can therefore only review the Trade-Mark Case. A careful consideration of that case will, I think, not only not defeat the conclusion which I have reached, but will tend to strengthen it.

That decision was rendered in the consideration of indictments brought under the purely penal sections of the trade-mark statute. Congress passed that statute upon the manifest assumption that the whole subject of trade-marks was a matter of national control under that clause of the Constitution providing that Congress shall have power "to promote the progress of science and useful arts by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." There was therefore no

possible room for the contention that Congress intended that the law should be applicable to those trade-marks only which were used in interstate commerce. And in the Sixth circuit the law was pronounced constitutional in a case on which the question was argued and decided upon that clause of the Constitution, and in which the opinion was advanced that it is the only provision by which the authority of Congress on the subject of trade-marks is conferred. That contention, however, was not insisted upon by the Attorney General in the Trade-Mark Cases. He based his main argument upon the commerce clause of the Constitution. The court, after considering the power of Congress to deal with the subject under the clause above quoted, and deciding adversely to such power, went on to consider the power of Congress to deal with the subject under the commerce clause of the Constitution.

The court refused to decide the question whether the trade-mark bears such a relation to commerce in general terms as to bring it within congressional control, when used or applied to the classes of commerce which fall within that control. The decision was that, when Congress undertakes to enact a law which can only be valid as a regulation of commerce, it is reasonable to expect to find on the face of the law or from its essential nature that it is a regulation of commerce with foreign nations or among the several states or with the Indian tribes; that, if not so limited, it is in excess of the power of Congress; that the act there under consideration was not so limited; that if its main purpose be to establish a regulation applicable to all trade, to commerce at all points, especially if it be apparent that it is designed to govern the commerce wholly between the citizens of the same state, it is obviously the exercise of a power not confided to Congress; that, if there is no recognition of this principle, it is invalid; that it was manifest that no such distinction was to be found in that act, but that its broad purpose was to establish a universal system of trade-mark registration for the benefit of all who had already used a trade-mark or who wished to adopt one in the future, without regard to the character of the trade to which it must be applied or the residence of the owner; and that it was therefore invalid. The court says:

"The question, therefore, whether the trade-mark bears such a relation to commerce in general terms as to bring it within congressional control, *when used or applied to the classes of commerce which fall within that control*, is one which, in the present case, we propose to leave undecided. We adopt this course because when this court is called on in the course of the administration of the law to consider whether an act of Congress, or of any other department of the government, is within the constitutional authority of that department, a due respect for a co-ordinate branch of the government requires that we shall decide that it has transcended its powers only when that is so plain that we cannot avoid the duty.

"In such cases it is manifestly the dictate of wisdom and judicial propriety to decide no more than is necessary to the case in hand. That such has been the uniform course of this court in regard to statutes passed by Congress will readily appear to any one who will consider the vast amount of argument presented to us assailing them as unconstitutional, and he will count, as he may do on his fingers, the instances in which this court has declared an act of Congress void for want of constitutional power.

"Governed by this view of our duty, we proceed to remark that a glance at

the commerce clause of the Constitution discloses at once what has been often the subject of comment in this court and out of it, that the power of regulation there conferred on Congress is limited to commerce with foreign nations, commerce among the states, and commerce with the Indian tribes. While bearing in mind the liberal construction that commerce with foreign nations means commerce between citizens of the United States and citizens and subjects of foreign nations, and commerce among the states means commerce between the individual citizens of different states, there still remains a very large amount of commerce, perhaps the largest, which, being trade or traffic between citizens of the same state, is beyond the control of Congress.

"When, therefore, Congress undertakes to enact a law, which can only be valid as a regulation of commerce, *it is reasonable to expect to find on the face of the law*, or from its essential nature, that it is a regulation of commerce with foreign nations, or among the several states, or with the Indian tribes. *If not so limited*, it is in excess of the power of Congress. If its main purpose be to establish a regulation applicable to all trade, to commerce at all points, especially if it be apparent that it is designed to govern the commerce wholly between citizens of the same state, it is obviously the exercise of a power not confided to Congress.

"We find no recognition of this principle in the chapter on trade-marks in the Revised Statutes. *We would naturally look for this in the description of the class of persons who are entitled to register a trade-mark, or in reference to the goods to which it should be applied. If, for instance, the statute described persons engaged in a commerce between the different states, and related to the use of trade-marks in such commerce*, it would be evident that Congress believed it was acting under the clause of the Constitution which authorizes it to regulate commerce among the states. So if, when the trade-mark has been registered, Congress had protected its *use on goods sold by a citizen of one state to another, or by a citizen of a foreign state to a citizen of the United States*, it would be seen that Congress was at least intending to exercise the power of regulation conferred by that clause of the Constitution. *But no such idea is found or suggested in this statute.* Its language is: 'Any person or firm domiciled in the United States, and any corporation created by the United States, or of any state or territory thereof'—or any person residing in a foreign country which by treaty or convention affords similar privileges to our citizens, may by registration obtain protection for his trade-mark. *Here is no requirement that such person shall be engaged in the kind of commerce which Congress is authorized to regulate.* It is a general declaration that *anybody in the United States*, and anybody in any other country which permits us to do the like, may, by registering a trade-mark, have it fully protected. So, while the person registering is required to furnish 'a statement of the class, of merchandise, and the particular description of the goods comprised in such class, by which the trade-mark has been or is intended to be appropriated,' *there is no hint that the goods are to be transported from one state to another, or between the United States and foreign countries.* Section 4939 is intended to impose some restriction upon the Commissioner of Patents in the matter of registration, *but no limitation is suggested in regard to persons or property engaged in the different classes of commerce mentioned in the Constitution.* The remedies provided by the act, when the right of the owner of the registered trade-mark is infringed, *are not confined to the case of a trade-mark used in foreign or interstate commerce.* "It is therefore manifest that no such distinction is found in the act, but that its broad purpose was to establish a universal system of trade-mark registration for the benefit of all who had already used a trade-mark, or who wished to adopt one in the future, *without regard to the character of the trade to which it was to be applied or the residence of the owner*, with the solitary exception that those who resided in foreign countries which extended no such privileges to us were excluded from them here."

The statute here under consideration discloses on its face that it is intended as a regulation of interstate and foreign commerce, being expressly confined to common carriers engaged in such commerce. The

purpose of the act is not to establish a regulation applicable to all trade, to commerce at all points, but simply to establish a regulation of interstate and foreign commerce. It is not designed to govern commerce wholly between citizens of the same state, but simply to protect interstate commerce. Local or intrastate commerce if affected at all by it, is only affected because the carrier may be at the same time and with the same means and agencies engaged in interstate commerce. If the act applied to all common carriers, irrespective of the character of commerce in which they might be engaged, it would come within the rule announced in the Trade-Mark Cases. But we find on the face of the law that it is expressly confined to common carriers engaged in interstate commerce, over which, under the authorities cited, Congress has paramount and exclusive control whenever it chooses to exercise its power. All these considerations distinguish and differentiate it from the act which was under consideration in the Trade-Mark Cases.

That Congress has since cured the defect in the former trade-mark laws, by providing that they shall apply to trade-marks used in commerce with foreign nations, or among the several states, or with Indian tribes (33 Stat. 724, c. 592 [U. S. Comp. St. Supp. 1905, p. 668]), would seem to indicate at least that the members of the judiciary committees in the two Houses of Congress, composed as they are of lawyers of great ability, have placed the same interpretation upon the decision in the Trade-Mark Cases as that indicated above.

As to the McKendree Case, it is to be observed that the order of the Secretary there being considered undertook "to make a stringent regulation with highly penal consequences," single in character, and including commerce wholly within the state. The order was not limited to interstate commerce. It was a regulation as to the transportation of cattle from one side of a line within a state to the other side of said line, and it applied "to all cattle transported from the south of this line to parts of the United States north thereof." "A party prosecuted for violating this order would be within its terms if the cattle were brought from the south of the line to a point north of the line within the state of Tennessee." It therefore included cattle transported wholly within the state of Tennessee from points south of the line to points north of it, as well as those which came from or were going to points outside of the state. It applied to all who might transport such cattle, whether engaged in interstate commerce or not. In other words, it was in no way limited to interstate commerce. What I have said, therefore, in relation to the Trade-Mark Cases is equally applicable to this case.

Again, let us remember that it is *the carrier,* one engaged in interstate commerce, which the act here in question regulates in relation to its duty to its employés, and that if it may be said (as I do not think it can be) to regulate intrastate commerce by reason of the fact that it may apply to an employé who at the time of his injury is engaged upon intrastate traffic, it is because of the manner or method in which the carrier conducts its business, combining or commingling its interstate with its intrastate commerce. The act here in question is directed to common carriers engaged in interstate or foreign commerce, and over such carriers Congress has plenary power.

In the construction of a statute the inquiry always is: What was the legislative intent? In the Trade-Mark Cases it was held that the act in question clearly indicated the legislative intent to embrace all trade-marks without respect to the character of the commerce in which they were used. In the McKendree Case it was held, first, that the act, if otherwise valid, evidenced no intent on the part of Congress to authorize the Secretary to promulgate the rule there involved, and, second, that the rule on its face carried with it no suggestion that the secretary intended thereby anything other or different from the plain import of its terms; that he evidently intended it to apply to all commerce, and that it was therefore invalid.

This act on its face relates to carriers engaged in interstate commerce. It extends to all such carriers. It extends to no others. Its fair meaning and interpretation is that it applies to all those employés of such carriers, and to those only, who have some relation to such commerce or to the means and agencies employed therein. Cases may possibly arise where a carrier engaged to some limited extent in interstate commerce may not be an interstate carrier within the meaning of this act, as respects a particular employé, or as respects the circumstances of some particular case. That remains to be declared when the case arises. Extreme cases which may have no existence, and which may never exist, are not to be conjured up for the purpose of defeating the obvious intention of Congress. Extraordinary situations are usually not in the minds of the lawmakers, and legislation is not to be held bad with reference thereto. If the general purpose of the law, as fairly indicated by its terms, is within constitutional limits, it will not be defeated by applying to it the test of some extreme case, possibly within the literal provisions of the act, but entirely beyond its spirit and meaning as a whole.

In the foregoing discussion reference has been made principally, if not altogether, to railroads engaged in interstate commerce, but the same principles and the same reasoning would apply as well to other common carriers engaged in such commerce. I am therefore of the opinion that the second ground on which the objection to the constitutionality of this act is based is not well taken.

The contention that the act is void because it denies the equal protection of the laws is, I think, without merit. It is beyond question that a state Legislature can change the common-law rules determining the liability of employer to employé as to all employers within its jurisdiction, and that such legislation would not be contrary to the fourteenth amendment, because the danger to employés is greater in some occupations than in others, or because in the same occupation some of the employés may be exposed to greater danger than others. It was the evident intention of Congress that the act here in question should embrace all employers and all of their employés to whom its power under the commerce clause of the Constitution extends, and, considering the extent of that power, the fact that it applies to all such employés, irrespective of the danger of their particular employments, no more affects its constitutionality than would such fact affect the constitutionality of a similar state enactment whose provisions were made applicable to all employers under its jurisdiction.

But, if the foregoing position is unsound, and if this congressional enactment is subject to the equal-protection paragraph of the fourteenth amendment, I am still of the opinion that, bearing in mind the object of the statute, the peculiar character of the business of the carriers affected, and the public nature of their functions, and the fact that they are all treated alike under similar circumstances and conditions, it is valid, because the classification therein made is within the range of the legislative discretion, and is practical, and not palpably arbitrary. Missouri Pacific Ry. Co. v. Mackey, 127 U. S. 205, 8 Sup. Ct. 1161, 32 L. Ed. 107; Tullis v. Lake Erie & Western R. R., 175 U. S. 348, 20 Sup. Ct. 136, 44 L. Ed. 192; St. L., I. M. & S. Ry. Co. v. Paul, 173 U. S. 404, 19 Sup. Ct. 419, 43 L. Ed. 746.

Nor can it be said that for this reason the law is harsh and inequitable, because where the danger is less the liability will less frequently arise, and, if there be practically no danger, there will be practically no liability. But, if it is, that would furnish no just cause for declaring it invalid. The remedy would lie not with the courts, but with Congress.

In Lottery Cases, supra, Mr. Justice Harlan says:

"But, as often said, the possible abuse of a power is not an argument against its existence. There is probably no governmental power that may not be exerted to the injury of the public. If what is done by Congress is manifestly in excess of the powers granted to it, then upon the courts will rest the duty of adjudging that its action is neither legal nor binding upon the people. But if what Congress does is within the limits of its power, and is simply unwise or injurious, the remedy is that suggested by Chief Justice Marshall, in Gibbons v. Ogden, when he said: 'The wisdom and the discretion of Congress, their identity with the people, and the influence which their constituents possess at elections, are, in this, as in many other instances, as that, for example, of declaring war, the sole restraints on which they have relied, to secure them from its abuse. They are the restraints on which the people must often rely solely, in all representative governments.'"

The contention that the act violates the tenth amendment of the Constitution is but another way of saying that it is not within the power of Congress under the commerce clause. And I think that no argument is necessary to refute the contention that it violates the fifth and seventh amendments.

I am therefore of the opinion that the act in question is constitutional and valid, and the demurrer must be overruled.

I am not unmindful of the fact that the foregoing opinion, in so far as it relates to the commerce clause of the Constitution, is in conflict with opinions already pronounced by other federal judges of the highest learning and ability, and I have approached and considered the questions involved with a just and real respect for decisions supported by such authority; but, feeling that I must exercise by own understanding and judgment with that independence which is expected from this department of the government, I find myself unable to reach any other conclusions than those above indicated.